[No. 6292–5–II. Division Two. March 4, 1985.]

PEGGY JENSEN, *Appellant,* v. SASHIKO BEAIRD,
ET AL, *Defendants,* RICHARD L. GOODRICH,
*Respondent.*

*Peter P. Strand* and *Douglass A. North,* for appellant.

*David H. Armstrong,* for respondent.

PETRICH, J.—Peggy Jensen was severely injured while a passenger on a motorcycle operated by Richard Goodrich. The motorcycle collided with an oncoming pickup truck operated by Sashiko Beaird in the motorcycle's lane of travel as Beaird was turning left into a private driveway. Jensen sued Beaird and Goodrich for her injuries. Goodrich cross–claimed against Beaird for his personal injuries and property damage.[1] Prior to trial on the claim and cross claim a "loan receipt agreement" was entered into by Jensen and Beaird whereby Jensen covenanted not to execute on any judgment she might obtain against Beaird in exchange for the sum of $110,000. The agreement further provided that Jensen would repay Beaird $1 for every $2 recovered against Goodrich in excess of $110,000 up to a maximum of $15,000, representing $10,000 advanced by Beaird over the insurance limits and $5,000 for Beaird's attorney's fees.[2]

---

[1]Additional cross claims between Goodrich and Beaird seeking indemnification and contribution were denied by the trial court and are not involved in this appeal.

[2]The agreement is as follows:
"WHEREAS: The parties to this agreement are presently involved in a lawsuit in Kitsap County as entitled above; and
"WHEREAS: The Plaintiff has sustained extremely severe and permanent injury to her damage in an amount far in excess of the consideration for this agreement; and
"WHEREAS: The Defendants Beaird have only $100,000.00 in liability insurance coverage which would apply to this lawsuit; and
"WHEREAS: The Defendants Beaird have limited personal resources available to pay any judgment in excess of their liability insurance coverage; and
"WHEREAS: The Plaintiff does not wish to force Defendants Beaird into a bankruptcy; and

Jensen received a favorable verdict against both defendants in the amount of $299,000. The jury on the Goodrich–Beaird cross claim determined that Goodrich was damaged in the amount of $14,800 but found Goodrich 15 percent and Beaird 85 percent at fault.

Characterizing the reduction of the verdict as a pro tanto reduction, the trial court reduced Jensen's judgment against Goodrich proportionate to the 15 percent fault attributed to Goodrich. This amounted to $44,850 rather than $189,000 ($299,000 verdict—$110,000 paid by Beaird).

Jensen appeals from the trial court's judgment in the reduced amount and Goodrich cross appeals.

The primary issue presented by Jensen's appeal is whether the "loan receipt agreement" impermissibly provides contribution to the settling tortfeasor and is thus repugnant to the principle of pro tanto reduction.

---

"WHEREAS: It is believed by the parties to this agreement that the Plaintiff will be successful in obtaining a judgment against Additional Defendants Goodrich, and such right to continue with such suit and post–judgment actions against Goodrich' is expressly reserved by the Plaintiff and agreed to by the defendants Beaird; now, therefore,

"IT IS HEREBY AGREED that for and in consideration of receipt by Plaintiff from Defendants of the sum of $110,000.00 ($100,000.00 from insurance and $10,000.00 from the personal assets of the Defendants Beaird), the Plaintiff hereby promises and covenants not to execute on any judgment against the Defendants Beaird in this cause of action or any other action as a result of the automobile/motorcycle accident of June 23, 1979. Such covenant not to execute by Plaintiff applies to all assets of Defendants Beaird, specifically releasing any interest Plaintiff might have in any real property presently owned or hereinafter acquired by Defendants Beaird.

"The parties hereto agree that such sum does not fully compensate Plaintiff for her injuries; that this agreement is not to be construed as a full or complete release; that Plaintiff is to continue with the lawsuit against Defendants Goodrich.

"IT IS FURTHER AGREED between the parties hereto that should Plaintiff obtain a judgment against the Goodrich' or any one of them, in excess of $110,000.00 (such being anticipated by both parties), then, in that event, the Plaintiff will reimburse the Defendants Beaird $1.00 for every $2.00 collected over and above the $110,000.00 paid under this agreement, until Defendants Beaird have been reimbursed the $10,000.00 of their personal funds plus up to $5,000.00 attorneys' fees incurred by them.

"IT IS SPECIFICALLY AGREED that this agreement is not a release and does not discharge the Defendants Goodrich or their insurer from liability for the injuries sustained by the Plaintiff in the accident of June 23, 1979."

In his cross appeal Goodrich challenges the sufficiency of evidence to support a finding of negligence against him; the granting and denial of certain jury instructions; an evidentiary ruling; and failure to bifurcate the negligence and damage aspects of the trial.

We modify the trial court's pro tanto reduction of the verdict and otherwise affirm.

The Goodrich motorcycle and Beaird truck collided when Beaird failed to see Goodrich and made a left turn in front of him. Goodrich had been proceeding on the motorcycle in the opposite direction on the same road as the Beaird truck. When Goodrich first observed the pickup, it was approaching him from more than 200 yards away. Goodrich observed the left turn signal blinking on the pickup and then saw the truck start to make a left–hand turn in front of him and then turn back into its own lane. The pickup then slowed down, and as Goodrich got closer, the pickup nearly stopped and then started to turn very slowly in front of Goodrich.

Goodrich released his throttle when the truck first started to turn and then turned back into its own lane. He did not recall applying his brakes at any time, nor were there any skid marks. Goodrich attempted to swerve around the front of the truck, but the motorcycle and truck collided.

We first address Jensen's contention that the court erred by granting Goodrich's motion for a pro tanto reduction of the judgment, thereby limiting Goodrich's liability to 15 percent of the total verdict.

## Pro Tanto Reduction of Verdict

In granting Goodrich's motion for a "pro tanto" reduction of the verdict, the trial court found persuasive the cases of *Baget v. Shepard*, 180 Cal. Rptr. 396 (Ct. App. 1982) and *Monjay v. Evergreen Sch. Dist. 114*, 13 Wn. App. 654, 537 P.2d 825 (1975). In *Baget*, the appellate court reversed the trial court's judgment for the entire amount of the verdict against a joint tortfeasor found to be 20 percent

at fault less only a small contribution from the settling tortfeasor found to be 80 percent at fault. The *Baget* court held that plaintiff's recovery against the defendant was reducible not by dollar amount received from the released tortfeasor, but by the released tortfeasor's proportionate share of plaintiff's damages as found by the jury. The *Baget* court characterized its decision as rejecting a pro tanto reduction rule and instead adopting an equitable reduction rule. *Baget,* 180 Cal. Rptr. at 406.

We disagree that *Baget* authorizes the trial court's reduction of Jensen's verdict to the proportionate share of Goodrich's negligence. First, the *Baget* court did not make a pro tanto reduction but rather an *equitable* reduction. Here, the trial court characterized the reduction as a pro tanto, not an equitable, reduction. Second, the *Baget* decision is directly contrary to California Supreme Court decisions upholding joint and several liability. *See, e.g., American Motorcycle Ass'n v. Superior Court,* 20 Cal. 3d 578, 578 P.2d 899, 146 Cal. Rptr. 182 (1978). The analysis in *Baget* has been seriously questioned. *See* Simmons, *The Effect of Comparative Fault on California Contribution,* 19 S.D. L. Rev. 773, 777 (1982). Finally, although the California Supreme Court denied hearing in *Baget,* in so doing it ordered that the *Baget* decision not be officially published.

In *Monjay,* the plaintiff entered into a covenant not to sue upon the settling co–tortfeasor's agreement to pay $33,333 to plaintiff upon conclusion of her case against the nonsettling co–tortfeasor. Plaintiff agreed to reimburse the settling parties in the amount recovered from the nonsettling party, up to $33,333. Plaintiff could not receive any money from the settling parties unless she obtained a judgment or settlement against the nonsettling party.

The *Monjay* court held invalid the conditional repayment provision in the covenant not to sue, citing the following reasons:

1. The loan agreement was repugnant to the principle of pro tanto reduction attendant to the covenant not to sue

because it effectively resulted in an indemnity or contribution to which the covenanting tortfeasors would not otherwise be entitled;

2. The clause had a coercive effect because the liability of the settling tortfeasor was relatively clear, while the liability of the nonsettling tortfeasor was not; and

3. The clause had strong overtones of champerty because it required the plaintiff to pursue the claim against the nonsettling tortfeasor. *Monjay,* 13 Wn. App. at 660–61. Even though finding the agreement invalid, the *Monjay* court gave plaintiff the option of rescinding the agreement with the settling parties or affirming the agreement without the conditional repayment clause, thus keeping the settlement money and discharging the school district on the grounds that she had been fully compensated. *Monjay,* 13 Wn. App. at 664.

On appeal, Jensen asks us to distinguish the loan agreement in the present case from the one considered in *Monjay.* She asks us to find that none of the three reasons cited by *Monjay* is present here. Conversely, Goodrich argues that the loan agreement between Jensen and Beaird echoes the three factors in *Monjay.*

The trial court found that the agreement did violate pro tanto reduction, citing *Monjay.* Jensen asserts that Goodrich is entitled to have the total verdict reduced by the full amount of the covenant not to execute ($110,000), and therefore Goodrich has the full benefit of a pro tanto reduction. We agree. For the reasons that follow, we disagree with *Monjay*'s holding that loan agreements violate the principle of pro tanto reduction or any other public policy.

Under present Washington law, and the law at the time of trial,[3] a plaintiff is entitled to judgment on the full

---

[3]The provisions of the legislative act dealing with joint tortfeasor contribution do not apply to this case because the cause of action arose, and the Jensen–Beaird agreement was signed, before July 26, 1981, the effective date of the act. RCW 4.22.920. There was no authority to seek and enforce contribution among joint tortfeasors. However, the principles of "comparative negligence" were then effec-

amount of the verdict against either or both joint tortfeasors.

> The cornerstone of tort law is the assurance of full compensation to the injured party. To attain this goal, the procedural aspect of our rule permits the injured party to seek full recovery from any one or all of such tort–feasors. So long as each tort–feasor's conduct is found to have been *a* proximate cause of the *indivisible* harm, we can conceive of no reason for relieving that tort–feasor of his responsibility to make full compensation for all harm he has caused the injured party. What may be equitable *between multiple tort–feasors* is an issue totally divorced from what is fair to the injured party.

*Seattle–First Nat'l Bank v. Shoreline Concrete Co.*, 91 Wn.2d 230, 236, 588 P.2d 1308 (1978).

Washington law further provided at this time that amounts paid by one joint tortfeasor, pursuant to a covenant not to execute or similar settlement device, diminish pro tanto the amount of plaintiff's claim against the remaining tortfeasors. *See, e.g., Christianson v. Fayette R. Plumb, Inc.*, 7 Wn. App. 309, 499 P.2d 72 (1972). However, as of the time of trial, no right of contribution existed among joint tortfeasors in this state, except that a tortfeasor whose negligence was "passive" was entitled to indemnification from a tortfeasor whose negligence was "active." *Reefer Queen Co. v. Marine Constr. & Design Co.*, 73 Wn.2d 783, 440 P.2d 453 (1968); *see* RCW 4.22.040(3). Where the facts do not fall within the exceptional line of cases appropriate for indemnification, it may fairly be argued that a "loan receipt agreement" permits a joint tortfeasor to achieve indirectly that which he could not do directly. In short, he may avoid an adjudication of liability and his joint tortfeasor may ultimately stand the entire loss. However, we disagree with *Monjay* that such a result violates the principle of pro tanto reduction.

In order to find a violation of the pro tanto principle,

---

tive and the apportionment of fault between Goodrich and Beaird was appropriate, but only on the cross claim.

*Monjay* first had to characterize the "loan" received under a loan receipt agreement as a "payment" in partial or full settlement of plaintiff's claim against the settling tort-feasor, and not as a valid and enforceable "loan." *Monjay* then found that the rule of pro tanto reduction encompasses not only the policy of preventing double recovery by the plaintiff, but also the policy of preventing indemnity or contribution to one who otherwise would not have been entitled.

> The few cases which have considered the validity of an agreement of this type (sometimes called loan agreements or loan receipts) have reached differing results. We are particularly impressed, however, with the reasoning presented in *Bolton v. Ziegler,* 111 F. Supp. 516 (N.D. Iowa 1953). There the court considered Iowa law, which like Washington's allows no right of contribution among joint tort–feasors, but does permit a pro tanto reduction in liability based on amounts paid pursuant to a covenant not to sue. The court found the loan agreement to be totally repugnant to the principle of pro tanto reduction attendant to the covenant not to sue. The court reasoned that the principle of pro tanto reduction was founded upon sound reasons of policy, and that such policy should not be thwarted by a loan agreement which effectively results in an indemnity or contribution to which the covenanting tort–feasors would not otherwise be entitled.

(Footnote omitted.) *Monjay,* 13 Wn. App. at 660–61.

 We now believe that a "loan" received under a loan receipt agreement should be considered as exactly that: a valid and enforceable loan, and not a payment. To consider this type of "loan" as a "payment" requires the court to rewrite the parties' agreement in a manner clearly contrary to the parties' intent, often without all of the parties before the court as was the case in *Monjay.* We realize that treating a loan in this way instead of as a payment deprives the remaining tortfeasor of the benefit of a reduction by the amount of the loan of any judgment against him, and the settling tortfeasor indirectly receives contribution. However, we do not believe that such a result violates the prin-

ciple of pro tanto reduction. The pro tanto principle should not be confused with the doctrine refusing contribution among tortfeasors. The doctrine refusing contribution among tortfeasors is rooted in equity, and the principal objection to contribution—use of the courts for relief of wrongdoers—is absent from this indirect, private out–of–court arrangement. *See Reese v. Chicago, B. & Q. R.R.*, 55 Ill. 2d 356, 303 N.E.2d 382, 386 (1973).

Moreover, there are salutary effects of the loan agreement which warrant our approval and dictate our departure from *Monjay*. Loan agreements encourage out–of–court settlements, help solve the economic needs of an injured person confronted with the delays in the court system, and tend to simplify complex multiparty litigation. *See Reese v. Chicago, B. & Q. R.R., supra;*[4] Annot., 62 A.L.R.3d 1111, 1121–22 (1975 & Supp. 1984).

The majority of courts are in accord with the position we adopt and uphold loan receipt agreements as valid, repayable loans rather than a partial payment of the injured party's claim. We believe that the willingness of a tortfeasor to place a substantial sum of money at his victim's disposal, with the possibility of no recoupment, is certainly to be encouraged, particularly from the view of the injured party whose receipt of redress might otherwise have to wait several years while prolonged and varied court battles are waged. *See American Transp. Co. v. Central Ind. Ry.*, 255 Ind. 319, 264 N.E.2d 64 (1970); Annot., *supra,* at 1122. In *Slaughter v. Pennsylvania X–Ray Corp.*, 638 F.2d 639, 643 (3d Cir. 1981), the court stated:

> We start with the fact that without the loan arrangement the settlement would not have occurred. Thus, the

---

[4]The court stated:

"Moreover, there are salutary effects of the loan agreement which warrant our approval. Because of the potential savings to some tortfeasors, funds under this arrangement will be more readily offered to injured plaintiffs than is the case under a covenant to forbear from suit or an outright settlement. Secondarily, loan receipts may tend to simplify complex multi–party litigation, and are desirable from the standpoint of facilitating private resolution of litigation." *Reese,* at 364.

plaintiff, an innocent victim, would have been compelled to wait years to receive compensation because of the defendants' inability to prophesy how a jury would allocate responsibility for the injury. Even the most astute and experienced defense lawyers will admit that it is often impossible to make such a prediction. In hindsight, it can be said that there was some basis for Delco's optimism because its culpability, as found by the jury, was substantially less than X–Ray's. But just as school boys often say, "a miss is as good as a mile," partial liability is liability nonetheless.

On a public policy basis, the arguments against the loan arrangement lack persuasiveness. Pennsylvania and other states encourage settlements, and obstructions to the process are not favorably regarded. To accept Delco's argument would close the door on a settlement method that allows participation by defendants unwilling to admit liability but not adverse to contributing if given the opportunity to recoup in the event of a favorable liability verdict.

(Citation omitted.)

We agree, along with the majority of courts which have considered loan agreements, that the policy of denying contribution between joint tortfeasors is outweighed by the above stated considerations favoring the private settlement of lawsuits.

The trial court, citing *Monjay,* found the loan agreement to be coercive, particularly because "the liability of the settling defendant is relatively clear, while the liability of the litigating defendant is not." *Monjay,* 13 Wn. App. at 661. We disagree with the trial court. Regardless of the agreement between Jensen and Beaird, because of the cross claim between Goodrich and Beaird, it was to Beaird's advantage to attempt to place as much fault upon Goodrich as possible. Thus, Beaird would have employed the same trial tactics with or without the agreement. Further, any coercive effect of the agreement could have been negated through introduction of the agreement into evidence, cross examination, and limiting instructions to the jury, none of which was attempted by Goodrich. Having failed to

attempt to limit any prejudice or bias possibly caused by the agreement, Goodrich cannot complain on appeal that the agreement was coercive as to him. *See Grillo v. Burke's Paint Co.*, 275 Or. 421, 551 P.2d 449, 452 (1976), and cases cited therein; Annot., *supra* at 1125. Moreover, the great weight of authority from other jurisdictions rejects the argument that loan receipt agreements undermine the adversary nature of trial or produce coercive effects, reasoning that there is no requirement under the law that codefendants be friendly. *See* Annot., *supra* at 1125–26. This is even more so when, as here, the codefendants have cross-claimed against each other.

The court relying on *Monjay*, 13 Wn. App. at 661, apparently believed that Jensen's arrangement with Beaird smacked of champerty by requiring Jensen to pursue the claim against Goodrich. We disagree that the agreement between Jensen and Beaird affirmatively required Jensen to sue Goodrich. While the agreement contained a provision stating, "Plaintiff is to continue with the lawsuit against defendant Goodrich," the more reasonable construction of the covenant, taken as a whole, indicates that the parties wanted to avoid having the covenant construed as a complete release discharging all parties.

Finally, Goodrich contends that having proposed the special verdict form and failing to object to it, Jensen is precluded from objecting on appeal to the special verdict rendered by the jury. We disagree. Question 7, in a special interrogatory submitted to the jury, read as follows:

Answer the following only if your answer to Question No. 1 and Question No. 3 were "yea"" [sic] Using 100% as the total combined negligence of defendants Beaird and Richard Goodrich which *contributed to the injury or damage of the plaintiff Peggy Jensen or each other,* what percentage of such negligence is:
Attributable to defendant Beaird?
ANSWER: ____%
Attributable to defendant Richard Goodrich?
ANSWER: ____%

No exception was taken to this instruction by any party.

The jury, having found in answer to question 1 that Beaird was negligent and in answer to question 3 that Goodrich was negligent, apportioned, as requested, the negligence causing injury or damage to Jensen or each other. The jury found that Beaird's negligence caused 85 percent and Goodrich's caused 15 percent. There were no objections to the verdict and the jury was dismissed.

 Generally, a jury may not apportion damages between joint tortfeasors who are jointly and severally liable. *Lindsey v. Elkins,* 154 Wash. 588, 283 P. 447 (1929); *Fugere v. Pierce,* 5 Wn. App. 592, 490 P.2d 132 (1971); *see* Annot., 46 A.L.R.3d 801, 808 (1972 & Supp. 1984). The majority of courts correct a violation of this rule by the jury. Annot., *supra* at 830. In *Lindsey v. Elkins,* it was held that either the trial court or appellate court can correct a verdict erroneously apportioned by the jury.

Here, the jury was instructed on contributory negligence and was told to determine the degree of such negligence expressed as a percentage attributable to the one claiming such injury. The issue of contributory negligence was raised only against Goodrich on his cross claim and the jury was instructed that the issue of contributory negligence did not apply to Jensen. Under these instructions, if the jury found Goodrich contributorially negligent it was required to apportion fault between Goodrich and Beaird.

We conclude that even though the jury apportioned fault between Goodrich and Beaird not only as to each other on their cross claims, but also as to Jensen, such apportionment by the jury was mere surplusage and cannot justify the trial court's reduction of Goodrich's judgment to only 15 percent of Jensen's damages.

Thus, we hold that the trial court erred by reducing Goodrich's share of the total verdict to only 15 percent. We find that the loan receipt provision contained in the covenant not to execute is valid. To the extent that *Monjay* requires otherwise, we expressly reject *Monjay* in favor of what we believe to be the better reasoning expressed in this opinion.

Jensen conceded on appeal that Goodrich should be entitled to have the total verdict reduced by $110,000, the full amount of the covenant not to execute. Because Jensen did not ask for, nor assert the right to, a reduction of the verdict by only $95,000 ($110,000 minus the $15,000 repaid under the loan agreement), we hold that Goodrich is entitled in this case to a reduction of the verdict ($299,000) by the full amount of the covenant not to execute ($110,000).[5]

## SUFFICIENCY OF THE EVIDENCE AND CLAIMED INSTRUCTIONAL ERROR

Goodrich assigns error to certain jury instructions and denial of others as well as the denial of his motion for a directed verdict and denial of his motion for a judgment notwithstanding the verdict. The main thrust of these assignments is that there is insufficient evidence to support either the giving of the instruction or the jury's finding him negligent.

■■ The tests for ruling on a motion for a directed verdict or judgment notwithstanding the verdict are essentially the same because both motions admit the truth of the nonmoving party's evidence and all reasonable inferences to be drawn therefrom; the trial court has no discretion and may grant the motions only where there is no competent evidence or reasonable inference which would sustain a jury verdict in favor of the nonmoving party. *Levy v. North Am. Co. for Life & Health Ins.*, 90 Wn.2d 846, 586 P.2d 845 (1978). However, negligence is not presumed, and the plaintiff has the burden of establishing it by substantial

---

[5]We note that even if we were to invalidate the loan receipt provision in this case as was done in *Monjay,* Jensen would still be entitled to the full amount of her verdict, barring, of course, reversal of the case on other grounds, as was the case in *Monjay.* Jensen then would still be able to collect the full amount of her verdict from Goodrich, minus the $110,000 Jensen would have received under the covenant not to execute with the invalidated payback provision. Thus, such a result would not be more favorable to Goodrich than the result we reach today. Even if the court were to accept Goodrich's argument that, despite *Monjay,* the whole covenant not to execute must be invalidated, Jensen would still be entitled to her judgment.

evidence. *Charlton v. Baker,* 61 Wn.2d 369, 378 P.2d 432 (1963). Thus, in determining whether to grant a motion for directed verdict or judgment notwithstanding the verdict, there must be "substantial evidence," as distinguished from a "mere scintilla" of evidence, to support the verdict, *i.e.,* evidence of a character which would convince an unprejudiced, thinking mind of the truth of the fact to which the evidence is directed. *Hojem v. Kelly,* 93 Wn.2d 143, 606 P.2d 275 (1980). Further, the trial court's instructions to the jury are sufficient if they are supported by substantial evidence and allow each party to sensibly argue his or her theories of the case. *Larson v. Pischell,* 13 Wn. App. 576, 535 P.2d 833 (1975). The trial court has considerable discretion as to how its instructions will be worded and as to how many instructions are necessary to fairly present each litigant's theories. *Connor v. Skagit Corp.,* 30 Wn. App. 725, 638 P.2d 115 (1981), *aff'd,* 99 Wn.2d 709, 664 P.2d 1208 (1983).

Goodrich contends the court erred by giving instruction 10, which read as follows:

> A statute provides that every motorcycle or motor-driven cycle shall have its headlamps lighted whenever such vehicle is in motion upon a highway.

Goodrich argues the instruction should not have been given for two reasons: (1) there was insufficient evidence the headlamp was not on; and (2) even if the headlamp was not on, there was no evidence that Goodrich knew or should have known that it was not. We disagree. While Goodrich's aunt testified to seeing the motorcycle headlight come on when he departed her home shortly before the accident, several witnesses testified that they did not see the motorcycle's headlamp on just prior to the collision. This testimony created a jury issue upon whether or not the motorcycle headlamp was on. The fact that the evidence may be circumstantial, rather than direct, makes no difference. *State Farm Mut. Ins. Co. v. Padilla,* 14 Wn. App. 337, 540 P.2d 1395 (1975). The testimony led with reasonable certainty to the conclusion that had the headlamp

been on, one of three witnesses likely would have seen it in the deeply shaded background and light in which the motorcycle was traveling. *See Grobe v. Valley Garbage Serv., Inc.,* 87 Wn.2d 217, 551 P.2d 748 (1976).

Moreover, instruction 13 provided:

The violation, if you find any, of a statute is negligence as a matter of law. Such negligence has the same effect as any other act of negligence.

While the violation of a statute is, generally speaking, negligence as a matter of law, such a violation is not negligence if it is due to some cause beyond the violator's control, and which ordinary care could not have guarded against.

This instruction gave the jury a basis for discarding the statutory violation posed by the motorcycle's headlamp not being on if, indeed, they found that the headlamp was not on. Under this instruction, Goodrich was fully able to argue to the jury that he was not negligent because ordinary care could not have detected nor prevented the headlamp not being on at the particular time before the accident. We find that the court's instruction regarding the headlamp violation is supported by substantial evidence and allowed Goodrich to fairly argue his theory of the case. *Hojem v. Kelly, supra; Larson v. Pischell, supra.*

Goodrich next contends that the trial court erred in giving instruction 12, which provided:

A statute provides that no person shall drive a vehicle at a speed greater than is reasonable and prudent under the conditions, having regard to the actual and potential hazards then existing. The driver shall so control speed as may be necessary to avoid colliding with others who are complying with the law and using reasonable care.

The statute provides that a driver shall drive at an appropriate reduced speed when special hazard exists with respect to other traffic.

The maximum statutory speed limit at the place here involved was 40 miles per hour.

Goodrich argues this instruction is erroneous because there was insufficient evidence of his speeding or, if so, that his speeding was a proximate cause of the accident. He also

argues there was no evidence that a "special hazard" existed. We also disagree with these arguments. Only 5 days after the accident, Goodrich stated that he had been going 40 to 50 miles per hour. This exceeds the posted speed limit of 40 miles per hour. Even though lower estimates of Goodrich's speed were given at trial by him and his experts, the conflict in testimony presented a jury question as to his speed. *See Nelson v. Blake,* 72 Wn.2d 652, 434 P.2d 595 (1967).

Both plaintiff's and defendant's experts gave conflicting testimony as to the contributing effect that Goodrich's speed had on the accident. Without going into detail, calculations made by plaintiff's experts demonstrated that the motorcycle's excessive speed, coupled with Goodrich's failure to take evasive action, was a contributing factor to the accident and therefore was a proximate cause of the accident.

Further, from the facts surrounding the accident, the jury could conclude that a prudent driver in Goodrich's position, observing the actions of the Beaird truck, should have realized that a "special hazard" existed requiring reduced speed or other evasive action on Goodrich's part. We further note that Goodrich failed at trial to except to the "special hazard" portion of the instruction. An instruction may not be challenged on appeal on a ground different from that upon which an exception at trial was based. *Owens–Corning Fiberglas Corp. v. Department of Labor & Indus.,* 25 Wn. App. 658, 612 P.2d 799 (1980). Thus, we conclude that the court's instruction regarding speed, proximate cause, and a special hazard was also supported by substantial evidence and allowed Goodrich to fairly argue his theory of the case. *Hojem v. Kelly, supra; Larson v. Pischell, supra.*

Goodrich next contends the court abused its discretion by failing to give his proposed instructions 22 and 23. Goodrich's proposed instruction 22 provided:

The speed of a vehicle, even if in excess of speed permitted by statute, is not a proximate cause of a collision

when the vehicle is where it is entitled to be on the roadway and the driver of the vehicle would not have had sufficient time to avoid the collision had he been driving at a lawful speed.

His proposed instruction 23 provided:

A driver in his proper lane of travel has the right to assume that an oncoming vehicle in the opposite lane will stay in its proper lane. In the event an oncoming vehicle turns into the wrong lane of travel, a driver in his proper lane has the right to assume such vehicle will return to his proper lane of travel. Such right continues until the driver in his proper lane knows, or in the exercise of reasonable care should know, that the oncoming vehicle is not going to get back into its proper lane.

Goodrich argues that the court's failure to give these instructions was prejudicial because it deprived him of his main theories of the case. He further argues that instructions on basic speed, proximate cause, statutory violation, emergency doctrine, and the right to assume others will obey the rules of the road are insufficient to replace his proposed instruction 22, citing *Braden v. Rees,* 5 Wn. App. 106, 485 P.2d 995 (1971). We disagree. Instructions 5 through 7 stated that only negligence which proximately caused plaintiff's damages should be considered in determining whether Goodrich was negligent. Further, a special interrogatory required the jury to answer whether Goodrich's negligence was a proximate cause of plaintiff's injuries. Thus, the instructions and the special interrogatory required the jury to only hold Goodrich liable for negligence which proximately caused plaintiff's damages. The special interrogatory served the purpose of limiting what negligence the jury could consider. This satisfied the concern expressed in *Braden v. Rees, supra.*

Furthermore, Goodrich's proposed instructions were duplicative of certain instructions given. Instruction 16 provided:

A favored driver is entitled to a reasonable reaction time after it becomes apparent in the exercise of ordinary

care that a disfavored driver is not going to yield the right of way.

This instruction allowed Goodrich to argue that he had insufficient time to respond to the crisis created by the Beaird truck regardless of what speed he was doing. He could argue that his speed was not a contributing factor to the collision and thus was not a proximate cause of Jensen's damages.

Instruction 14 provided:

Every person using a public street or highway has the right to assume that other persons thereon will use ordinary care and will obey the rules of the road, and has a right to proceed on such assumption until he or she knows, or in the exercise of ordinary care should know, to the contrary.

This instruction, coupled with the admonition in instruction 12 that a driver turning left shall yield the right of way, gave the jury the same law as that in Goodrich's proposed instruction 23. Goodrich was fully able to argue his theory of the case to the jury. Thus, we conclude that the court did not abuse its discretion by refusing to give Goodrich's proposed instructions 22 and 23. *Connor v. Skagit Corp., supra.*

## EVIDENTIARY RULING

Goodrich next contends that the trial court abused its discretion by refusing to allow a state trooper to testify as to his opinion of Goodrich's speed at the time of the accident. The trial court did not allow the testimony because the trooper had not used any skid marks nor made any mathematical calculations in forming his opinion. Whether a witness qualifies to give expert opinion is left to the trial court's discretion. *Gerard v. Peasley,* 66 Wn.2d 449, 403 P.2d 45 (1965). Goodrich cites no authority to support his contention that discretion is abused in these circumstances, and unless well taken on its face, we need not consider it on appeal. *State v. Fortun,* 94 Wn.2d 754, 626 P.2d 504 (1980). Nevertheless, because no foundation was laid upon which the trooper could base an opinion, we

find no abuse of discretion in not allowing this particular testimony.

## BIFURCATION

Goodrich finally contends that the court abused its discretion by failing to grant his pretrial motion to bifurcate the issues of liability and damages. Goodrich argues the motion should have been granted because Jensen had argued through two separate pretrial motions that the strength of her case was the seriousness of her injuries. The denial of a motion to bifurcate will not be disturbed absent a showing of abuse of the trial court's discretion. *Hawley v. Mellem,* 66 Wn.2d 765, 405 P.2d 243 (1965). We disagree that it was an abuse of discretion not to grant the motion to bifurcate. Even though the trial judge commented after trial that had he been given the opportunity to bifurcate the trial, he would have done so, he still felt that he could not reverse the discretionary ruling made before trial by another judge. We likewise believe there was no abuse of discretion in denying the pretrial motion to bifurcate.

The judgment is modified to award Jensen a judgment against Goodrich in the amount of her verdict, namely $299,000 less the sum of $110,000. Except as modified herein the judgment is affirmed.

WORSWICK, C.J., and PETRIE, J. Pro Tem., concur.

Review denied by Supreme Court May 24, 1985.