

**FILE**

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE AUG 1 5 2013

*Madsen, C.J.*
CHIEF JUSTICE

This opinion was filed for record
at 8:00 a.m. on Aug. 15, 2013

Ronald R. Carpenter
Supreme Court Clerk

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| JARED K. BARTON, a single man, | ) | |
| | ) | |
| Respondent, | ) | No. 86924-3 |
| | ) | |
| v. | ) | EN BANC |
| | ) | |
| STATE OF WASHINGTON, | ) | |
| DEPARTMENT OF | ) | |
| TRANSPORTATION, | ) | |
| | ) | |
| Petitioner, | ) | Filed: AUG 1 5 2013 |
| | ) | |
| KORRINE C. LINVOG, individually; | ) | |
| THOMAS LINVOG and | ) | |
| MADONNA LINVOG, husband | ) | |
| and wife, | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |
| SKAGIT COUNTY DEPARTMENT | ) | |
| OF PUBLIC WORKS, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

FAIRHURST, J.—This case concerns a partial settlement agreement made between a plaintiff and some, but not all, defendants in the aftermath of a

motorcycle and motor vehicle accident. In the underlying suit, Jared K. Barton sued Korrine C. Linvog, Korrine's[1] parents, Thomas and Madonna Linvog (hereinafter the Linvogs), and the State of Washington. Prior to trial, Barton executed an agreement with the Linvogs. In the agreement, the Linvogs agreed to advance Barton $20,000 in exchange for Barton's promise not to execute on a judgment against them above their insurance policy limits. Neither Barton nor the Linvogs initially disclosed the agreement to the court or the State. After a 16 day trial, the jury awarded Barton $3.6 million and the court entered judgment against the State, Korrine, and the Linvogs. In the process of paying the judgment, the State learned about the agreement. The State moved to vacate the judgment on the grounds of fraud and misrepresentation. The trial court denied the motion to vacate but sanctioned Barton's attorney for failing to disclose the agreement pursuant to discovery requests. We affirm.

## FACTS AND PROCEDURAL HISTORY

Korrine was driving her parents' car when she pulled into an intersection and collided with Barton, who was approaching the intersection on his motorcycle with the right of way. Barton suffered serious injuries, including brain damage. Barton sued Korrine for negligence and sued the Linvogs under the family car

---

[1]We refer to Korrine by her first name for sake of clarity. No disrespect is intended.

doctrine. Barton also sued the Washington State Department of Transportation under the theory of negligent highway design and maintenance.

William Spencer, attorney for the Linvogs, offered to settle with Barton for the limits of the Linvogs' insurance policy—$100,000. Ralph Brindley, Barton's attorney, refused the settlement offer because he wanted to maintain joint liability between Korrine, the Linvogs, and the State. However, Brindley apparently told Spencer that his normal policy was not to pursue claims against individuals in excess of their insurance policy limits.

Almost two years after the accident occurred, Brindley sought a $20,000 advance from the Linvogs to pay for medical expenses incurred by Barton, who was uninsured. Spencer, seeing an opportunity to cap the liability of his clients in the event of a verdict rendered solely against the Linvogs, drafted a document entitled "Stipulation of Parties Regarding Advanced Payment" (the Stipulation). Clerk's Papers (CP) at 924-25. The Stipulation provided that the Linvogs (through their insurance company Mutual of Enumclaw) would pay Barton $20,000 and such payment would reduce (by $20,000) any future settlement or verdict against the Linvogs. The Stipulation further provided that Barton "would not execute on any judgment" he obtained from the Linvogs in excess of their liability insurance. CP at 925. The Stipulation concluded that "the advance payment does not represent a settlement of any claims Plaintiff Jared Barton has brought in this matter against

3

Defendants." *Id.* Brindley signed the Stipulation but it was not signed by anyone else. Spencer and Brindley did not intend the Stipulation to affect Korrine's liability to Barton or the State's contribution rights against Korrine or the Linvogs. Mutual of Enumclaw tendered a $20,000 check to Barton, which he cashed.

Some months earlier, the State had sent discovery requests to Barton and the Linvogs asking whether the parties had entered into any pretrial settlements, releases, or agreements. In their initial responses, both Barton and the Linvogs denied the existence of any such agreement, which was true at the time. After executing the Stipulation, however, neither Brindley nor Spencer thought to supplement their answers to the State's requests.

After a 16 day trial, the jury returned a $3.6 million verdict in Barton's favor. The jury found Korrine 5 percent at fault ($180,000) and the State 95 percent at fault ($3.42 million). Because the court had earlier granted summary judgment on the issue of Barton's comparative fault—finding Barton fault free—Korrine, the Linvogs, and the State were jointly and severally liable for Barton's injuries. The court entered judgment against Korrine, the Linvogs, and the State.

The State appealed the trial court's evidentiary rulings and the court's granting of Barton's motion for summary judgment on the issue of comparative fault. But the Court of Appeals affirmed and remanded. *Barton v. State*, noted at 147 Wn. App. 1021, 2008 WL 4838687, *review denied*, 166 Wn.2d 1012, 210 P.3d

1018 (2009). After remand, Barton sought to collect his judgment from the Linvogs and the State. Mutual of Enumclaw paid Barton the balance of the Linvogs' policy limits—$80,000. Brindley executed a partial satisfaction of judgment in the amount of $100,000. In the course of discussing the payment of the judgment with Spencer and Brindley, the State learned about the Stipulation and obtained a copy of the Stipulation from Spencer.

Soon after learning about the Stipulation, the State filed a motion to vacate the judgment of the trial court and for new trial and for sanctions. The State alleged that Barton and the Linvogs' failure to disclose the Stipulation (1) amounted to fraud and misrepresentation, (2) warranted severe discovery sanctions, (3) constituted a "Mary Carter"[2] agreement that improperly realigned the interests of the parties, and (4) resulted in an unfair trial because (a) the State was unable to cross-examine Korrine to establish bias and (b) the family car doctrine jury instruction inaccurately stated that the parents were liable for Korrine's share of fault. The State deposited its share of the judgment ($3.42 million) in the registry of the court, requesting that the funds be held in trust pending the motion to vacate.

The trial court denied the State's motion to vacate. In a detailed memorandum decision, the trial court found that the failure to disclose the Stipulation did not prejudice the State and did not affect the outcome of the trial.

---

[2]*See Booth v. Mary Carter Paint Co.*, 202 So. 2d 8 (Fla. Dist. Ct. App. 1967).

The trial court found discovery sanctions were warranted for Brindley's failure to supplement his interrogatory answers (Spencer was not subject to sanctions). The trial court ordered that Barton would not receive $146,000 in interest that he otherwise would have been entitled to receive (interest that accrued over the nine months between the State's depositing the judgment with the court and the release of the funds to Barton). The State appealed, arguing that the trial court erred by denying the State's motion to vacate. In an unpublished decision, the Court of Appeals affirmed the trial court on all grounds. *Barton v. State*, noted at 164 Wn. App. 1024, 2011 WL 5175599.

The trial court ordered the State to pay Barton's judgment balance ($80,000). The trial court also entered judgment against Korrine and the Linvogs in favor of the State on its claim for contribution in the amount of $92,632.30 ($80,000 plus interest), plus interest at the judgment rate. The State filed a petition for review, which we granted. *Barton v. State*, 174 Wn.2d 1008, 278 P.3d 1112 (2012).

## ISSUES

A.    Does an agreement between a plaintiff and some, but not all, defendants, in which the defendants give the plaintiff an advance payment in exchange for plaintiff's promise not to execute on a judgment in excess of defendants' insurance policy limits, release the defendants so that they are not jointly and severally liable with nonagreeing defendants?

6

B.    Did the Stipulation negate Korrine and the Linvogs' contribution liability?

C.    Did the trial court abuse its discretion in its choice of sanctions?

ANALYSIS

A.    Does an agreement between a plaintiff and some, but not all, defendants, in which the defendants give the plaintiff an advance payment in exchange for plaintiff's promise not to execute on a judgment in excess of defendants' insurance policy limits, release the defendants so that they are not jointly and severally liable with nonagreeing defendants?

We granted review on the State's question of whether the Stipulation destroyed joint and several liability between the State, Korrine, and the Linvogs. Essentially, the State asks this court to determine whether the Stipulation released the Linvogs within the meaning of RCW 4.22.060 and .070—a question not reached by the trial court or the Court of Appeals. The State argues that the operative legal effect of the Stipulation released the Linvogs, thus destroying joint and several liability and negating the State's contribution rights. The State argues that the trial court's failure to accord the Stipulation its operative legal effect was reversible legal error. After discussing the standard of review and Washington's joint and several liability scheme as it relates to released parties, we turn to the question of whether the Stipulation released the Linvogs. We hold that the Stipulation did not release the Linvogs under RCW 4.22.070; thus, they were jointly and severally liable for Barton's damages.

*Standard of Review.* We generally review a trial court's decision on a motion to vacate for abuse of discretion. *Haley v. Highland*, 142 Wn.2d 135, 156, 12 P.3d 119 (2000). In this case, however, we granted review to determine whether the Stipulation destroyed joint liability under RCW 4.22.070(1), which requires the court to define the term "release" as used in that statute. We review issues of statutory interpretation and alleged errors of law de novo. *Jongeward v. BNSF Ry.*, 174 Wn.2d 586, 592, 278 P.3d 157 (2012) (citing *State v. Breazeale*, 144 Wn.2d 829, 837, 31 P.3d 1155 (2001)).

1. *Under Washington's joint and several liability scheme, a "released" defendant is not jointly and severally liable and is not liable for contribution to other defendants against whom judgment is entered*

To understand the issue presented by this case, it is necessary to briefly outline Washington's joint and several liability scheme. Generally, when multiple tortfeasors cause a plaintiff's injuries, each tortfeasor is liable only for damages corresponding to its proportionate share of fault as determined by the trier of fact. RCW 4.22.070(1). However, when multiple tortfeasors are responsible for a plaintiff's injuries, and the plaintiff is zero percent at fault, tortfeasors against whom judgment is entered are jointly and severally liable for the sum of their proportionate shares of the plaintiff's damages. RCW 4.22.070(1)(b).

A plaintiff must obtain a judgment against each defendant before multiple defendants are jointly and severally liable. *Gerrard v. Craig*, 122 Wn.2d 288, 298,

857 P.2d 1033 (1993). "Settling parties, released parties, and immune parties are not parties against whom judgment is entered and will not be jointly and severally liable under RCW 4.22.070(1)(b)." *Kottler v. State*, 136 Wn.2d 437, 447, 963 P.2d 834 (1998) (citing *Washburn v. Beatt Equip. Co.*, 120 Wn.2d 246, 294, 840 P.2d 860 (1992); *Anderson v. City of Seattle*, 123 Wn.2d 847, 852, 873 P.2d 489 (1994) (A released party "cannot under any reasonable interpretation of RCW 4.22.070(1)(b) be a defendant against whom judgment is entered.")).

A joint and severally liable defendant who pays more than his or her proportionate share may seek contribution from another defendant against whom judgment has been entered pursuant to RCW 4.22.040, .050, and .060. RCW 4.22.070(2). But joint and several liability must exist before a defendant has a right to contribution from another defendant. "Contribution is conditioned on the existence of joint and several liability because absent such common joint and several liability one party will have no duty to pay another's liability for damages and, thus, no cause for subsequent reimbursement." *Kottler*, 136 Wn.2d at 442. Since "released" tortfeasors cannot be jointly and severally liable with nonreleased tortfeasors, released tortfeasors are not liable for contribution.

2.   *A plaintiff who executes a settlement device listed in RCW 4.22.060 with some, but not all, defendants, does not necessarily "release" a defendant under RCW 4.22.070*

Washington's comparative fault statutes, chapter 4.22 RCW, do not define "release." "Our fundamental purpose in construing statutes is to ascertain and carry out the intent of the legislature." *In re Marriage of Schneider*, 173 Wn.2d 353, 363, 268 P.3d 215 (2011) (citing *Lake v. Woodcreek Homeowners Ass'n*, 169 Wn.2d 516, 526, 243 P.3d 1283 (2010)). "We determine the intent of the legislature primarily from the statutory language." *Id.* (citing *Lacey Nursing Ctr. v. Dep't of Revenue*, 128 Wn.2d 40, 53, 905 P.2d 338 (1995)). "In the absence of ambiguity, we will give effect to the plain meaning of the statutory language." *Id.* (citing *TracFone Wireless, Inc. v. Dep't of Revenue*, 170 Wn.2d 273, 281, 242 P.3d 810 (2010)).

The term "release" is not ambiguous. The plain meaning of "release" is the "surrender of a claim, which may be given for less than full consideration, or even gratuitously." *DeNike v. Mowery*, 69 Wn.2d 357, 366, 418 P.2d 1010, 422 P.2d 328 (1966); *see also* BLACK'S LAW DICTIONARY 1403 (9th ed. 2009) (defining "release" as "[l]iberation from an obligation, duty, or demand; the act of giving up a right or claim to the person against whom it could have been enforced"); W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS 332 (5th ed. 1984) ("a release is a surrender of the cause of action, which may be gratuitous, or

10

given for inadequate consideration"); WARREN FREEDMAN, JOINT AND SEVERAL LIABILITY: ALLOCATION OF RISK AND APPORTIONMENT OF DAMAGES 70 (1987) (a release is "a surrender of the cause of action, gratuitously or for some consideration").

The State advocates for a different interpretation of RCW 4.22.070(1) and the term "release." The State points out that RCW 4.22.060, the statute governing the effect of settlement agreements, also uses the term "release." RCW 4.22.060(1) requires notice and court approval of "a release, covenant not to sue, covenant not to enforce judgment, or similar agreement." RCW 4.22.060(2) discharges the contribution liability of one who obtains a "release, covenant not to sue, covenant not to enforce judgment, or similar agreement." The State reads RCW 4.22.060 together with RCW 4.22.070 to conclude that a defendant who is a party to "a covenant not to sue," "a covenant not to enforce judgment," or "similar agreement" is "released" under RCW 4.22.070(1).

The State's argument is not without merit. The Court of Appeals has read RCW 4.22.060 together with RCW 4.22.070 to conclude that when a defendant enters into "a release, covenant not to sue, covenant not to enforce judgment, or similar agreement," RCW 4.22.060, then the defendant is "released" under RCW 4.22.070(1). *See Maguire v. Teuber*, 120 Wn. App. 393, 396, 85 P.3d 939 (2004) ("Read as a whole, this statute suggests that releases, covenants and similar

11

agreements all constitute 'releases' for purposes of determining who had been 'released' under RCW 4.22.070." (footnote omitted)); *Romero v. W. Valley Sch. Dist.*, 123 Wn. App. 385, 387, 98 P.3d 96 (2004) (adopting the analysis from *Maguire*).

The *Maguire* court based its holding, in part, on the opinion of Washington law review articles that speculated that a "covenant not to sue, covenant not to enforce judgment, or similar agreement," RCW 4.22.060, would release covenanting parties under RCW 4.22.070. *See, e.g.*, J. Michael Philips, *Looking out for Mary Carter: Collusive Settlement Agreements in Washington Tort Litigation*, 69 WASH. L. REV. 255, 273-74 (1994) ("The language of the 1986 Tort Reform Act and its interrelationship with the 'effects of settlement' statute suggest that the legislature intended Mary Carter-type agreements to be treated as settlements." (footnote omitted) (citing RCW 4.22.070, .060)); Cornelius J. Peck, *Reading Tea Leaves: The Future of Negotiations for Tort Claimants Free from Fault*, 15 U. PUGET SOUND L. REV. 335, 344 (1991-92) ("a court will treat a contract not to execute as a release or settlement under RCW 4.[22].070"); Gregory C. Sisk, *Interpretation of the Statutory Modification of Joint and Several Liability: Resisting the Deconstruction of Tort Reform*, 16 U. PUGET SOUND L. REV. 1, 50 (1992-93) (citing Peck, *supra*). The commentators were concerned that

12

litigants would use these settlement devices to falsely manufacture joint and several liability.

We disagree with the *Maguire* court's interpretation of RCW 4.22.070 because it does not account for the plain, unambiguous meaning of the term "released." The *Maguire* court, rather than determining the plain meaning of "released" in RCW 4.22.070, looked solely to "closely related statutes" to ascertain "the underlying legislative purpose" and concluded that all settlement devices listed in RCW 4.22.060 have the effect of "releasing" a defendant under RCW 4.22.070. *Maguire*, 120 Wn. App. at 396 (citing *Gallo v. Dep't of Labor & Indus.*, 119 Wn. App. 49, 54, 81 P.3d 869 (2003)); *see also* David Beninger & Joel Cunningham, *Settlement Agreements: Are Lions Now Tigers and Bears (Oh My)?*, TRIAL NEWS, Jan. 2006, at 5 (suggesting that the *Maguire* court used a "grammatical trick" to equate the types of settlement devices listed in RCW 4.22.060 to the term "released" in RCW 4.22.070). By not considering the plain meaning of the term "release," the *Maguire* court erroneously equated a "covenant not to sue, covenant not to enforce judgment, or similar agreement," RCW 4.22.060, to complete "releases."

The *Maguire* court also thought its interpretation of RCW 4.22.070 was "consistent with case law," specifically *Kottler* and *Shelby v. Keck* 85 Wn.2d 911, 541 P.2d 365 (1975). *Maguire*, 120 Wn. App. at 397. As discussed in the following

13

section, we do not find that these cases mandate the result reached by the *Maguire* court. The *Maguire* court failed to take into account the fact that Washington courts have enforced partial, pretrial settlement devices that do not completely release a covenanting defendant. For instance, Washington courts have found that covenants not to sue,[3] covenants not to execute judgment,[4] and loan receipt agreements[5] do not necessarily "release" a defendant.

---

[3]Under the common law, the release of one defendant released all other defendants, regardless if there was a full satisfaction of the claim. Scott I. Anderson, *Contribution Among Tort-Feasors in Washington: The 1981 Tort Reform Act*, 57 WASH. L. REV. 479, 493 (1982) (citing cases). In order to avoid this harsh common law rule, parties began executing covenants not to sue. "While a release relinquishes all rights to a claim against another party, the covenant not to sue retains those rights and grants a promise not to enforce them." FREEDMAN, *supra*, at 81; *see also* 1 SETTLEMENT AGREEMENTS IN COMMERCIAL DISPUTES: NEGOTIATING, DRAFTING & ENFORCEMENT § 9.04, at 9-22 (RICHARD A. ROSEN ED., 2008) ("A covenant not to sue does not relinquish any claims, but rather constitutes an agreement not to initiate litigation against specific parties.").

Prior to tort reform, Washington courts consistently distinguished covenants not to sue from releases. *See, e.g.*, *Mills v. Inter Island Tel. Co.*, 68 Wn.2d 820, 829, 416 P.2d 115 (1966) (holding covenant not to sue did not release a joint tortfeasor where there is no double recovery); *Haney v. Cheatham*, 8 Wn.2d 310, 322, 111 P.2d 1003 (1941) (under the common law rule, a covenant not to sue releases a covenanting defendant when the defendant reasonably compensates the plaintiff); *Richardson v. Pac. Power & Light Co.*, 11 Wn.2d 288, 317, 118 P.2d 985 (1941) (whether an agreement is a release or a covenant not to sue depends on the consideration exchanged, the effect of the agreement, and the circumstances attending its execution); *but see Monjay v. Evergreen Sch. Dist. No. 114*, 13 Wn. App. 654, 659, 537 P.2d 825 (1975) ("A covenant not to sue will be treated as a release of all tort-feasors if reasonably compensatory consideration has been paid by one or more tort-feasors to the plaintiff.").

[4]A covenant not to levy execution or covenant not to execute "is a device that does not interfere with plaintiff securing the judgment, at least in the eyes of all other tortfeasors." FREEDMAN, *supra*, at 83. In the insurance context, "A covenant not to execute coupled with an assignment and settlement agreement does not release a tortfeasor from liability; it is simply 'an agreement to seek recovery only from a specific asset—the proceeds of the insurance policy and the rights owed by the insurer to the insured.'" *Besel v. Viking Ins. Co. of Wis.*, 146 Wn.2d 730, 737, 49 P.3d 887 (2002) (quoting *Safeco Ins. Co. of Am. v. Butler*, 118 Wn.2d 383, 399, 823 P.2d 499 (1992)).

[5]A loan receipt agreement is "a lawful arrangement by which the insurer advances to its insured the amount of a covered loss as a loan, repayable only and to the extent that the insured

14

Despite the State's arguments to the contrary, we find such settlement devices tend to further the underlying policies of the tort reform act of 1981, chapter 4.22 RCW. *See Jensen v. Beaird*, 40 Wn. App. 1, 10, 696 P.2d 612 (1985) (partial settlement devices "encourage out-of-court settlements, help solve the economic needs of an injured person confronted with the delays in the court system, and . . . simplify complex multiparty litigation"). In particular, partial settlement devices encourage tortfeasors "to place a substantial sum of money at [their] victim's disposal, with the possibility of no recoupment," when "the injured party . . . might otherwise have to wait several years while prolonged and varied court battles are waged." *Id.* The *Maguire* court's interpretation of RCW 4.22.070 ignores precedent distinguishing partial settlement devices from releases and interferes with a plaintiff's ability to settle his or her claims.

We hold the execution of a "covenant not to sue, covenant not to enforce judgment, or similar agreement," RCW 4.22.060, does not necessarily "release" a defendant under RCW 4.22.070. We find the *Maguire* court's analysis flawed because the Court of Appeals ignored the plain meaning of "release," failed to distinguish between releases and other partial settlement agreements, and reached a

---

obtains a net recovery from others also liable." *U.S. Oil & Ref. Co. v. Lee & Eastes Tank Lines, Inc.*, 104 Wn. App. 823, 832, 16 P.3d 1278 (2001); DAVID K. DEWOLF & KELLER W. ALLEN, 16 WASHINGTON PRACTICE: TORT LAW AND PRACTICE § 12.49 (2012). This type of agreement "has been upheld in almost all the cases." *Monjay*, 13 Wn. App. at 660 n.3 (citing *Clow v. Nat'l Indem. Co.*, 54 Wn.2d 198, 339 P.2d 82 (1959)); *see also Jensen v. Beaird*, 40 Wn. App. 1, 10, 696 P.2d 612 (1985); *Bolton v. Zeigler*, 111 F. Supp. 516 (N. D. Iowa 1953).

result that interferes with a plaintiff's ability to settle his or her claims. To the extent that the Court of Appeals analyzed RCW 4.22.070 together with .060 in *Maguire* and *Romero*, those cases are overruled. However, as discussed in the following section, the holdings of *Maguire* and *Romero* remain intact because reading RCW 4.22.070 together with .060 was not necessary to the outcome of those cases.

In summary, we reject the State's argument that the Stipulation—essentially a covenant not to execute judgment—had the operative legal effect of releasing the Linvogs. We are mindful that partial settlement devices executed between plaintiffs and some, but not all, defendants pose the risk of collusion between parties. But we find that the requirements of disclosure and reasonableness hearings sufficiently address these concerns. Furthermore, we find that partial settlement devices do not undermine the tort reform act because they encourage out-of-court settlements and speedy compensation to injured victims. In the following section, we apply traditional principles of contract interpretation to determine whether the Stipulation "released" the Linvogs under RCW 4.22.070.

> 3. *Pretrial, partial settlement agreements should be interpreted under traditional principles of contract interpretation*

Barton and the Linvogs argue that the Stipulation should be given the effect that the parties intended. We agree. We hold that the Stipulation did not release the Linvogs because Barton and the Linvogs did not intend the Stipulation to release

16

the Linvogs. Like the trial court and the Court of Appeals, we do not analyze issues of contract formation or defenses to enforcement (i.e., impossibility, mutual mistake, contrary to public policy) because the parties do not address these issues.

"A release is a contract and its construction is governed by contract principles subject to judicial interpretation in light of the language used." *Nationwide Mut. Fire Ins. Co. v. Watson*, 120 Wn.2d 178, 187, 840 P.2d 851 (1992); *see also Del Rosario v. Del Rosario*, 152 Wn.2d 375, 382, 97 P.3d 11 (2004) ("This court has consistently held that personal injury releases are contracts governed by contract principles."); 1 SETTLEMENT AGREEMENTS IN COMMERCIAL DISPUTES: NEGOTIATING, DRAFTING & ENFORCEMENT § 9.01[B], at 9-3 (RICHARD A. ROSEN ED., 2008) ("Because releases are contracts, contract law governs the formation and interpretation of releases.") (hereinafter SETTLEMENT AGREEMENTS). "A court's primary task in interpreting a written contract is to determine the intent of the parties." *United States Life Credit Ins. Co. v. Williams*, 129 Wn.2d 565, 569, 919 P.2d 594 (1996); *see also Mills v. Inter Island Tel. Co.*, 68 Wn.2d 820, 829, 416 P.2d 115 (1966) ("[T]he distinction between a covenant not to sue and a release will be preserved according to the intention of the parties."); 1 SETTLEMENT AGREEMENTS, *supra*, § 9.03[A], at 9-19 (if a release is ambiguous, "the court will proceed to consider the intent of the parties"). In determining whether the partial

settlement agreement releases a covenanting defendant, Washington courts have explicitly, or implicitly, looked to the intent of the parties to resolve ambiguity.

In *Shelby*, Gary Keck accidentally shot and killed Verna Shelby in a tavern, and Shelby's estate sued Keck and the restaurant that had served alcohol to Keck prior to the shooting. 85 Wn.2d at 912. Keck reached an agreement with Shelby's estate where Keck's insurance company paid the estate $25,000—Keck's insurance policy limits—and the estate agreed not to execute on a judgment against Keck. *Id.* The trial court granted the restaurant's motion to dismiss Keck from the lawsuit. *Id.* at 912-13. This court affirmed Keck's dismissal. *Id.* at 917. We noted the parties intended the agreement to be a "binding settlement" that left "no justiciable issue to be resolved between [the] parties." *Id.* at 918. In other words, we found that the estate intended to completely release Keck in exchange for his payment of $25,000.

In *Maguire*, John Maguire sued Steven Teuber after Teuber rear-ended Maguire's car. 120 Wn. App. at 394. Maguire also sued the State—for faulty highway design—and the owner of the car, William Hadsall. *Id.* Maguire executed an agreement with Teuber and Hadsall where they agreed to pay Maguire $100,000—their insurance policies limits—and Maguire promised not to execute a judgment against either Teuber or Hadsall. *Id.* After disclosure of the agreement,

the State moved to dismiss Teuber and Hadsall but the trial court denied the State's motion.

The Court of Appeals reversed, holding (1) the covenant not to execute "released" Teuber and Hadsall under RCW 4.22.070, (2) the trial court erred in entering judgment against Teuber and Hadsall, and (3) the trial court erred in dismissing Teuber and Hadsall. *Maguire*, 120 Wn. App. at 399. In holding that the agreement released Teuber and Hadsall, the Court of Appeals reasoned that the agreement was "'intended to constitute a *complete resolution* of all claims.'" *Id.* at 397-98, 399 (quoting covenant not to execute). Above, we held that the *Maguire* court erred by analyzing RCW 4.22.070 together with .060 to conclude that the covenant not to execute "released" Teuber and Hadsall. Nevertheless, the *Maguire* court properly held that the agreement released Teuber and Maguire because the parties intended the agreement to be a "*complete resolution* of all claims." *Id.* at 397-98, 399.

In *Romero*, Michael and Carrie Romero sued the West Valley School District for negligence after a vehicle struck and killed the Romeros' young child in the school load and unload zone. 123 Wn. App. at 387. Mr. Romero and the child's estate cross-claimed against Ms. Romero, who had been responsible for picking the child up from school. *Id.* Mr. Romero and the child's estate executed an agreement with Ms. Romero with the following terms:

Ms. Romero agreed to pay the limits of her automobile insurance and $5,000. Mr. Romero and the estate agreed that if they obtained a judgment of more than $30,000 against the District, they would reimburse Ms. Romero $1 for every $2 they collected from the District over the $30,000 amount, up to $5,000. They also agreed that Ms. Romero would remain in the suit as a defendant. But Mr. Romero and the estate would not execute on any judgment obtained against her.

*Id.* at 388. The parties submitted the agreement to the trial court, which found the agreement reasonable. *Id.* After trial, the jury found the school district 75 percent responsible for the Romeros' damages and Ms. Romero 25 percent responsible. *Id.* at 389. The trial court entered judgment against the school district and Ms. Romero.

The Court of Appeals—relying on *Maguire*—held that the agreement "released" Ms. Romero. The Court of Appeals reversed the judgment so that the school district was not jointly and severally liable for Ms. Romero's share of fault. *Id.* at 392. The Court of Appeals found that the agreement was a "classic 'Mary Carter' agreement" that was made for the purpose of "avoid[ing] the 'several' liability scheme." *Id.* at 389-90. The Court of Appeals concluded "the intended result [of the agreement] is contrary to the letter and spirit of the tort reform act." *Id.* at 392.

In the present case, the Stipulation did not have the effect of releasing the Linvogs because the parties did not intend the Stipulation to release the Linvogs. Barton has consistently argued that he did not intend to release either Korrine or

20

Linvogs. The Linvogs have consistently taken the position that they believed they remained liable for Korrine's proportionate share of fault above the Linvogs' insurance policy limits. Neither Barton nor the Linvogs intended the Stipulation to negate the State's right to seek contribution from the Linvogs. The trial court found, "Plaintiff's counsel and Linvogs' counsel believed the agreement was valid and enforceable on these terms." CP at 9.

*Shelby*, *Maguire*, and *Romero* each involved a settlement agreement that released the covenanting defendant or defendants. These cases can be distinguished from the case at bar.

Unlike the parties in *Shelby*, Barton and the Linvogs did not intend to make a "binding settlement" that left "no justiciable issue to be resolved between [the] parties." 85 Wn.2d at 918. The Stipulation expressly stated that it "[did] not represent a settlement of any claims" between Barton and any defendants. CP at 925. Also, despite the execution of the Stipulation, justiciable issues remained concerning the Linvogs' liability to Barton. The State could still seek contribution from the Linvogs and the Linvogs' liability to Barton could have been anywhere from $20,000 to $100,000. *Shelby* is distinguishable from the case at bar.

In *Maguire*, the Court of Appeals found that the agreement between Maguire, Teuber, and Hadsall constituted a *"complete resolution* of all claims." 120 Wn. App. at 397-98. In this case, the parties did not intend to make a complete

21

resolution of Barton's claims against the Linvogs. The *Maguire* agreement contained "release language." *Id.* at 398. The Stipulation in this case does not.

*Romero* can be distinguished by the fact that it involved a "classic 'Mary Carter' agreement" that sought to avoid Washington's several liability scheme in contrast to the "letter and spirit of the tort reform act." 123 Wn. App. at 392. The Stipulation is not a Mary Carter agreement.[6] In fact, it is more like a high-low agreement, a type of partial settlement agreement that has been approved in other jurisdictions.[7] We agree with the trial court that the Stipulation did not realign the interests of the parties or attempt to artificially manufacture joint and several liability between an individual and a deep pocket institutional defendant. The

---

[6]A Mary Carter agreement is a settlement device that generally contains three basic provisions: (1) "the settling defendant guarantees the plaintiff a minimum payment, regardless of the court's judgment;" (2) "the plaintiff agrees not to enforce the court's judgment against the settling defendant;" and (3) "the settling defendant remains a party in the trial, but his exposure is reduced in proportion to any increase in the liability of his codefendants over an agreed amount." John E. Benedict, *It's a Mistake To Tolerate the Mary Carter Agreement*, Note, 87 COLUM. L. REV. 368, 369-70 (1987). Some agreements might also require that "the agreement be kept secret between the settling parties." *Id.* at 370. The name "Mary Carter agreement" is taken from the first case to analyze these types of settlement devices, *Booth v. Mary Carter Paint Co.* The Stipulation is not a Mary Carter agreement because the third element is not met. Since this case does not involve a Mary Carter agreement, we will wait until this issue is squarely presented to rule on the validity of such agreements in Washington.

[7]In a high-low agreement, the covenanting defendant promises to pay plaintiff a minimum amount, regardless of the verdict, but defendant's liability is capped at an agreed upon maximum amount. *See, e.g., Ziegler v. Wendel Poultry Servs., Inc.*, 67 Ohio St. 3d 10, 615 N.E.2d 1022, 1029-30 (1993) (high-low settlement agreement was valid because the settling defendant still had an incentive to keep the amount of damages down), *overruled on other grounds by Fidelholtz v. Peller*, 1998-Ohio-462, 81 Ohio St. 3d 197, 690 N.E.2d 502, 505; *Hodesh v. Korelitz*, 2009-Ohio-4220, 123 Ohio St. 3d 72, 914 N.E.2d 186, 190 (relying on *Ziegler*).

22

State's right to seek contribution was not affected. In short, the Stipulation does not present the same concerns as the agreement in *Romero*.

In conclusion, the Stipulation did not release the Linvogs; therefore, they were jointly and severally liable with the State for Barton's damages. The trial court and Court of Appeals denied the State's motion to vacate on the grounds that the State was not prejudiced by the Stipulation. At the State's request, we granted review on the question of whether the Stipulation released the Linvogs under RCW 4.22.070. We hold that it did not.

B.     Did the Stipulation negate Korrine and the Linvogs' contribution liability?

In its petition for review, the State argues, "RCW 4.22.060(2) mandates that a covenant not to execute negates contribution liability." Pet. for Review at 4. The State further asks, "Can a covenant not to execute be written in a way so that it does not negate contribution liability?" *Id.* Above, we held that the Stipulation did not release the Linvogs because the parties did not intend to completely release them. The Linvogs were jointly and severally liable with the State for Barton's damages. Accordingly, judgment was entered against the Linvogs. It follows that the State's right to seek contribution from the Linvogs was preserved. Without accepting the State's invitation to rule on whether a covenant not to execute will always negate contribution rights, we hold that the Stipulation in this case did not negate the State's contribution rights.

A joint and severally liable defendant who pays more than his proportionate share may seek contribution from another defendant against whom judgment has been entered pursuant to RCW 4.22.040, .050, and .060. RCW 4.22.070(2). "[I]t is well to observe that it is not easy to find a procedural mechanism whereby a settling defendant could be certain that claims of contribution and/or indemnity would be cut off as part of the settlement with the plaintiff." FREEDMAN, *supra*, at 73.

In this case, the State, Korrine, and the Linvogs were jointly and severally liable for Barton's injuries. The trial court entered judgment against the defendants. The State paid more than its proportionate share of Barton's damages and obtained a contribution judgment against the Linvogs. RCW 4.22.060(2) seeks to protect released or covenanting defendants from contribution claims brought by other defendants who did not settle with the plaintiff. The Linvogs did not seek to hide behind the protections of RCW 4.22.060(2) but instead recognized their obligation to pay the State's contribution claim. After collecting contribution from the Linvogs, the State will have only paid its share of fault as assigned by the jury. The Stipulation did not negate the State's right to contribution against the Linvogs.

C.    Did the trial court abuse its discretion in its choice of sanctions?

The State argues that Barton and the Linvogs' failure to disclose the Stipulation pursuant to discovery rules and RCW 4.22.060, merits serious

sanctions such as a new trial. We disagree and hold that the trial court did not abuse its discretion in sanctioning Barton.

*Standard of review.* We review a trial court's order of sanctions for abuse of discretion. *Rivers v. Wash. State Conference of Mason Contractors*, 145 Wn.2d 674, 684, 41 P.3d 1175 (2002). "'[D]iscretionary determination should not be disturbed on appeal except on a clear showing of abuse of discretion, that is, discretion manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons.'" *Id.* at 684-85 (alteration in original) (internal quotation marks omitted) (quoting *Burnet v. Spokane Ambulance*, 131 Wn.2d 484, 494, 933 P.2d 1036 (1997)). "The abuse of discretion standard . . . recognizes that deference is owed to the judicial actor who is 'better positioned than another to decide the issue in question.'" *Wash. State Physicians Ins. Exchange & Ass'n v. Fisons Corp.*, 122 Wn.2d 299, 339, 858 P.2d 1054 (1993) (internal quotation marks omitted) (quoting *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 403, 110 S. Ct. 2447, 110 L. Ed. 2d 359 (1990). We give wide latitude to a trial court in fashioning an appropriate sanction for discovery abuse. *Id.* at 339.

*Analysis.* Generally, "the court may impose only the least severe sanction that will be adequate to serve its purpose in issuing a sanction." *Teter v. Deck*, 174 Wn.2d 207, 216, 274 P.3d 336 (2012). To support imposition of one of the greater sanctions—such as a new trial—the record must clearly show (1) one party

willfully or deliberately violated the discovery rules and orders, (2) the opposing party was substantially prejudiced in its ability to prepare for trial, and (3) the trial court explicitly considered whether a lesser sanction would have sufficed. *Magana v. Hyundai Motor Am.*, 167 Wn.2d 570, 584, 220 P.3d 191 (2009) (citing *Burnet*, 131 Wn.2d at 494). The purposes of sanctions are to deter, punish, compensate, educate, and ensure that the wrongdoer does not profit from the wrong. *Fisons*, 122 Wn.2d at 356.

The State is correct in arguing that Barton and the Linvogs' failure to disclose the Stipulation violated RCW 4.22.060(1) and CR 26(e)(2). RCW 4.22.060(1) requires that a party, "prior to entering into a release, covenant not to sue, covenant not to enforce judgment, or similar agreement," shall give notice of the settlement to the court and other parties and the court shall hold a hearing to determine whether the settlement was reasonable. The statute does not set forth any consequences for failing to disclose. CR 26(e)(2) requires parties to "seasonably" amend or supplement discovery requests. Under CR 26(e)(4), failure to comply with CR 26(e)(2) "will subject the party to such terms and conditions as the trial court may deem appropriate." CR 37 "sets forth the rules regarding sanctions when a party fails to make discovery." *Magana*, 167 Wn.2d at 583-84. "CR 37(d) authorizes a court to impose the sanctions in CR 37(b)(2), which range

from exclusion of evidence to granting default judgment when a party fails to respond to interrogatories and requests for production." *Id.* at 584.

Barton and the Linvogs concede that they failed to comply with the disclosure requirements of RCW 4.22.060 and failed to supplement their responses to the State's discovery requests. But the trial court found that the parties' failure to disclose the Stipulation was not willful or deliberate and the State's ability to prepare for trial was not substantially prejudiced. The trial court sanctioned Barton and Brindley by not requiring the State to pay $146,000 in interest the State otherwise would have owed to Barton. This is a significant sanction. The State has not made any showing that the severe sanctions it has requested are justified. We hold that the trial court did not abuse its discretion in sanctioning Barton and Brindley.

## CONCLUSION

We hold that the Stipulation did not release the Linvogs under RCW 4.22.070. The Linvogs were jointly and severally liable with the State for Barton's damages. The Stipulation did not affect the State's right to contribution against the Linvogs. The trial court did not abuse its discretion in sanctioning Brindley and Barton. We affirm the Court of Appeals.

27

Fairhurst, J.

WE CONCUR:

No. 86924-3

MADSEN, C.J. (concurring/dissenting)—The majority's analysis is based on an incorrect assumption about the nature of the "Stipulation" (hereafter "agreement") between plaintiff Jared Barton and Thomas and Madonna Linvog (the Linvogs), the parents of Korrine Linvog (Korrine). The majority incorrectly assumes that the agreement falls within the scope of RCW 4.22.060. In addition, the majority seems to accept the State's contention that if the agreement released the Linvogs, joint and several liability was destroyed and the State should have been only severally liable for damages due to its own fault. However, Korrine was not a party to the agreement and she remained liable for damages attributed to her fault. Regardless of whether the Linvogs were released, joint and several liability remained because Korrine was jointly and severally liable for 100 percent of the damages suffered.

Parties can enter agreements that partially settle some claims without invoking RCW 4.22.060, and that is what occurred here. Since the agreement did not eliminate the Linvogs' liability for contribution, it was not the type of agreement that falls within RCW 4.22.060.

Since this agreement is not a covenant not to enforce judgment as that term is used in RCW 4.22.060, it is not necessary in this case to decide whether a document that does fall within this statute is a release that also acts to release the party from joint and several liability under RCW 4.22.070. But if an agreement does fall within the scope of RCW 4.22.060 and settles the claims between the parties, the court should hold that it acts as a release for purposes of RCW 4.22.070. This conclusion follows from the plain language of RCW 4.22.060 and the interrelationship between RCW 4.22.060 and .070.

Finally, since RCW 4.22.060 is not applicable, the trial court abused its discretion in awarding sanctions for violation of the notice requirement in the statute. It follows that the State's request for more severe sanctions under the statute should be denied.

## Discussion

### Nature of the Linvogs' and Korrine's Liability

It is important to understand the nature of the defendants' potential liability in this case. Under the family car doctrine, Thomas and Madonna Linvog were exposed to liability for their daughter Korrine's negligence in causing the injuries suffered by the plaintiff, Jared Barton. The Linvogs[1] potential liability arose "based on agency principles; that is, members of the family who are permitted to drive the automobile are agents of the owners." 16 DAVID K. DEWOLF & KELLER W. ALLEN, WASHINGTON PRACTICE: TORT LAW AND PRACTICE § 3.23, at 139 (3d ed. 2012); *see Coffman v. McFadden*, 68 Wn.2d 954, 958, 416 P.2d 99 (1966) ("[a] parent is not liable for the torts

---

[1] For clarity, I refer to Thomas and Madonna Linvog as "the Linvogs," and to Korrine Linvog as "Korrine."

2

of his child solely because of the relationship . . . liability, if any exists, must rest upon the relation of agency or service"). It does not arise when the parents of the driver neither own nor control the vehicle. 16 DEWOLF & ALLEN, *supra*, § 3.23, at 139.

This type of liability comes within RCW 4.22.070(1)(a), which provides that "[t]he liability of each defendant shall be several only and shall not be joint except . . . [a] party shall be responsible for the fault of another person or for payment of the proportionate share of another party . . . when a person was acting as an agent or servant of the party." By the references to "party," this subsection contemplates that Korrine's parents had to be parties to the suit for this liability to arise. That is, unless the Linvogs remained as parties in the action, they would not be liable to the plaintiff for damages arising from Korrine's negligence.

Korrine's potential liability, on the other hand, falls within RCW 4.22.070(1)(b), which provides for joint and several liability when the plaintiff is fault free.[2]

*The parties' agreement did not "destroy" joint and several liability*

The agreement says that the parties agreed and stipulated that the Linvogs' insurer had paid $20,000 to Barton as an advance payment against any future settlement or verdict obtained against the "Defendants Korinne Linvog [and] her parents, Thomas and

___

[2] RCW 4.22.070 provides:
>  (1) . . . The liability of each defendant shall be several only and shall not be joint except:
>
>     . . . .
>
>     (b) If the trier of fact determines that the claimant or party suffering bodily injury or incurring property damages was not at fault, the defendants against whom judgment is entered shall be jointly and severally liable for the sum of their proportionate shares of the claimants [claimant's] total damages.

3

Madonna Linvog." Clerk's Papers (CP) at 924. It says this advance payment is to be an offset against "any judgment, verdict, arbitration award, or settlement obtained by Plaintiff Jared Barton against Defendants Korrine Linvog and/or Defendants Thomas and Madonna Linvog." *Id.* at 924-25. In return for the advance payment, Barton agreed not to execute on any judgment he obtained against the *Linvogs* in excess of the liability insurance available to the Linvogs through their insurer. He would, however, be able to execute on any judgment against the Linvogs up to the amount of the insurance limits available. Finally, the agreement states that the advance payment does not represent a settlement of Barton's claims "against Defendants." *Id.* at 925.

The State maintains that the plaintiff and the Linvogs "achieved the imposition of improper joint liability against the State because the covenant not to execute was kept hidden. By doing so, they circumvented the abolition of joint liability that is at the core of" the tort reform act. Suppl. Br. of the State of Washington, Dep't of Transp. at 17. The State argues that the Court of Appeals improperly permitted the parties to determine the operative legal effect of a release and thereby override statutory mandates. The State says that the outcome of a statutory analysis cannot vary based on the litigants' "financial whims." *Id.* at 12.

But Barton did not agree not to execute on a judgment against Korrine. Moreover, the agreement accurately states that it is not a settlement against "Defendants," who are identified in the document as both the Linvogs and Korrine. Because it had no effect on

4

Korrine or her liability, the agreement plainly did not act as a settlement with regard to her.

The "fault" on which liability is based for both the Linvogs and Korrine is that of Korrine; the Linvogs' liability is vicarious. With or without the agreement, Korrine's fault was before the jury; the agreement did not remove Korrine's share of fault from the scope of RCW 4.22.070's apportionment scheme. The jury's apportionment of fault between Korrine and the State meant that these two defendants were jointly and severally liable. Therefore, the agreement did not eliminate joint and several liability.

In addition, the parties to the agreement intended that it would affect only Barton's ability to execute on the judgment against the Linvogs. The trial court's unchallenged finding of fact is that the parties to the agreement believed and intended that the Linvogs were in fact still liable after they entered the agreement because the agreement had no effect on contribution rights. CP at 9. Nothing in the agreement itself purports to excuse the Linvogs from any liability for contribution. This is in marked contrast to the agreement at issue in *Maguire v. Teuber*, 120 Wn. App. 393, 397-98, 85 P.3d 939 (2004), where a covenant not to execute expressly stated that it was intended to "'completely'" resolve "'all claims by the plaintiffs against the defendants'" who were parties to the agreement and "'any and all contribution claims against those defendants will be extinguished by this settlement.'" (Quoting agreement.)

*The agreement was not a "covenant not to enforce judgment"
within the meaning of RCW 4.22.060*

Because Korrine's fault was still before the jury, and because any contribution rights against the Linvogs based on vicarious liability were not affected by the agreement, it was not an agreement that extinguished contribution rights and was not an "agreement" under RCW 4.22.060(2) "similar to" a "release" or a "covenant not to sue" that would "discharge[]" the Linvogs "from all liability for contribution."

I recognize that the part of the agreement where Barton agreed not to execute on any judgment against the Linvogs on any amount in excess of the insurance limits raises the obvious question whether it is a covenant not to enforce judgment for purposes of RCW 4.22.060. But as the majority states, contract law has a place here, and we should look to the entire document to see whether it is the kind of agreement "similar" to a "release" as RCW 4.22.060 states.

What the parties call an agreement is not controlling. Even if Barton and the Linvogs had called their agreement a "covenant not to enforce judgment," this would not control as to whether it fell within the scope of RCW 4.22.060 as equivalent to a "release." In a similar vein, the parties' statement that the agreement was not a settlement, in and of itself, does not determine how it should be treated, either. Rather, the operative effect of the agreement controls and this must be determined with regard to all that the document provides.

I would hold that the agreement does not come within RCW 4.22.060, thus ending the case.

6

*The majority errs in deciding that an agreement that falls within
RCW 4.22.060 does not release the party for purposes of RCW 4.22.070's
determination of joint and several liability*

It follows that this case does not require us to decide whether a covenant not to enforce judgment under RCW 4.22.060 is necessarily a release under RCW 4.22.070. But while it is unnecessary to construe the term "release" as used in RCW 4.22.070, since the majority has done so, I turn to that issue next.

The majority improperly declines to construe the term "release" in the statutory context in which it appears and instead relies on dictionary and other definitions to conclude that an agreement that comes within RCW 4.22.060 does not necessarily release the party for purposes of RCW 4.22.070. But the majority's resort to these definitions does not follow our well-developed approach to discerning the meaning of language in statutes.

The goal when construing a statute is to ascertain and give effect to the legislature's intended meaning. We determine legislative intent from the meaning of the words at issue, the context of the statute in which the provision at issue is found, related provisions and statutes that bear on the meaning of the language at issue, and the statutory scheme as a whole. *Manary v. Anderson*, 176 Wn.2d 342, 352, 292 P.3d 96 (2012); *Lowry v. PeaceHealth*, 174 Wn.2d 769, 779, 280 P.3d 1078 (2012); *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 11, 43 P.3d 4 (2002). Rather than deliberating ignoring the related statutory provisions as the majority does, we should examine them as the best indicator of legislative intent.

Both RCW 4.22.060 and .070 use the word "release." In RCW 4.22.060, the legislature listed several types of settlement agreements, expressly equating them within the statute to a "release" ("[a] release, covenant not to sue, covenant not to enforce judgment, or *similar* agreement" (emphasis added)). This statutory provision itself shows that an agreement that comes within the statute is to be regarded as a release. *See* Cornelius J. Peck, *Reading Tea Leaves: The Future of Negotiations for Tort Claimants Free from Fault*, 15 U. PUGET SOUND L. REV. 335, 344 (1992) ("RCW 4.22.060 refers to 'a release, covenant not to sue, covenant not to enforce judgment, or similar agreement' as being interchangeable for the purpose of determining the effect of a settlement agreement").

In addition to equating the listed agreements with a release, RCW 4.22.060 provides that these agreements operate to extinguish contribution obligations, as noted. When considered in connection with RCW 4.22.070, this part of RCW 4.22.060 supports the conclusion that an agreement falling within RCW 4.22.060 operates as a release for purposes of RCW 4.22.070.

RCW 4.22.070(1) states in part that "entities whose fault shall be determined include . . . entities released by the claimant" and "[j]udgment shall be entered against defendant except those who have been released by the claimant." RCW 4.22.070(2) says that a jointly and severally liable defendant's rights to contribution against another jointly and severally defendant and the effect of a settlement by either is determined under RCW 4.22.040, .050, and .060. Thus, the right to contribution mentioned in RCW 4.22.070 that

8

is determined under RCW 4.22.040, .050, and .060 is a right that arises among jointly and severally liable defendants, but it cannot not arise under the agreements listed in RCW 4.22.060.

This interrelationship of the statutes, too, shows that the agreements listed in RCW 4.22.060 do operate to release an entity for purposes of joint and several liability under RCW 4.22.070. And in fact, this is the construction favored by a leading authority on the 1986 tort reform laws. Peck, *supra*, at 335, 343-44.

Unlike the majority, I would hold that an agreement that comes within RCW 4.22.060, and which is equivalent to a "release" as expressly provided by the statute, acts to release the party for purposes of the apportionment of liability under RCW 4.22.070.

Next, I disagree with the majority's overruling of the analysis in *Maguire* regarding the issue whether the agreements in those cases released the defendants who were party to them. The agreement at issue in *Maguire* was a covenant not to enforce judgment within the scope of RCW 4.22.060. The Court of Appeals appropriately concluded that it operated to release the defendants who were a party to it and therefore these defendants should have been dismissed from the case. The covenant stated that the parties were settling "'for the purpose of avoidance of the uncertainties, inconvenience, and expenses of the pending lawsuit'" and that the covenant "'is intended to constitute *a complete resolution* of all claims by the plaintiffs against defendants Teuber and Hadsall under RCW 4.22.060 such that any and all contribution claims against those defendants

will be extinguished by this settlement.'" *Maguire*, 120 Wn. App. at 397-98 (quoting covenant).

Because it was an agreement coming within RCW 4.22.060, it released the two defendants for purposes of RCW 4.22.070, as explained above. The court's analysis in the case is well-reasoned and consonant with the relevant statutes.

As with *Maguire*, I disagree with the majority's partial overruling of *Romero v. West Valley School District*, 123 Wn. App. 385, 98 P.3d 96 (2004). *Romero* involves a classic "Mary Carter" agreement. It provided that the defendant who was party to the agreement would pay the limits of insurance and the plaintiffs agreed that if they recovered more than the insurance limits from the remaining defendant, the defendant-party to the agreement would be reimbursed by the plaintiffs $1 for every $2 the plaintiffs recovered in excess of the insurance. The parties agreed the settling defendant would remain in the suit as a defendant. In such circumstances, there is a strong incentive on the part of the settling defendant and the plaintiff to skew the trial against the remaining defendant. The Court of Appeals, relying on *Maguire*, concluded in *Romero* that the agreement released the settling defendant and held that the remaining defendant was severally liable only for the portion of the damages due to its own fault.

When an agreement manipulates joint and several liability as the agreement did in *Romero*, and aligns the plaintiffs and all but one of the potentially liable defendants against the remaining defendant, a court should conclude that joint and several liability has been destroyed. For this reason, at the least, such an agreement should be held to

release the settling defendants. Otherwise, their presence at trial and in the jury's calculations can result in unfair joint and several liability on the part of the nonsettling defendant.

*Sanctions*

The State maintains that a more severe sanction should be imposed for failure to notify it of the "secret" agreement between Barton and the Linvogs. The majority concludes that the failure to disclose the parties' agreement violated CR 26(e)(2) as a failure to seasonably amend or supplement discovery requests and violates RCW 4.22.060(1), which requires that "prior to entering into a release, covenant not to sue, covenant not to enforce judgment, or similar agreement with a claimant" a party must "give five days' written notice of such intent to all other parties and the court." The majority therefore holds that the trial court did not err in exercising its discretion to impose the sanctions. The majority denies, however, the State's request for more severe sanctions.

Although the majority states that Barton and the Linvogs concede they failed to comply with the notice requirement of RCW 4.22.060, majority at 26, this does not appear to be the case. Rather, Barton concedes some sanction was appropriate under the civil rule, but not a greater sanction as urged by the State. The Linvogs do not concede the propriety of sanctions under the statute, either.

Because the court should hold that the agreement is not a "covenant not to enforce judgment" as contemplated under RCW 4.22.060(2), it should similarly hold the

11

agreement does not come within RCW 4.22.060(1). The statutory notice provision does not apply and sanctions are not appropriate on this basis. I would conclude that the trial court abused its discretion in awarding sanctions under the statute and agree that the State's request for additional (more severe) sanctions under the statute should be denied.[3]

## Conclusion

I would hold that the agreement between Barton and the Linvogs is not a covenant not to enforce judgment as this term is used in RCW 4.22.060. Korrine and the State both remained as defendants at trial, neither was a party to the agreement, and together they were responsible for 100 percent of fault, once Barton was determined to be a fault-free plaintiff. They were jointly and severally liable. No settlement occurred that reduced liability for total damages because Korrine remained exposed to direct liability and the Linvogs remained, under the parties' agreement, exposed to liability for contribution. In these circumstances there was no prejudice to the State and no additional sanctions are appropriate.

---

[3] My disagreement extends to the award of sanctions only insofar as it is based on RCW 4.22.060. I do not disagree that the award may be appropriate under CR 26.

12

Madsen, C.J.

Wiggins, J.

13