IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| JADE JUSTAD, as Personal Representative of Estate of Alan Justad and beneficiaries Jade Justad, Marika Justad and Miro Justad; ALI EDRISS and SALLY BEAVEN; HENRY C. WONG and ANDREA LEE WANG, husband and wife, individually and as Co-Personal Representatives of the ESTATE OF SARAH PANTIP WONG; BRITTANY GAYLE CADELINA, a single woman, | No. 83907-1-I DIVISION ONE UNPUBLISHED OPINION |
| Respondents, | |
| v. | |
| OMEGA MORGAN SARENS, LLC, a foreign limited liability company; OMEGA RIGGING & MACHINERY MOVING, INC., a Washington corporation, | |
| Appellants, | |
| NORTHWEST TOWER CRANE SERVICE, INC., a Washington corporation, | |
| Respondent. | |

CHUNG, J. — While being disassembled by a team of five contractors, a tower crane used to build an office building in Seattle collapsed and fell onto a busy city street, resulting in multiple fatalities and injuries. A jury found that four of the contractors were negligent and that the negligence of three of them was a

proximate cause of plaintiffs' deaths and injuries. It apportioned fault among the three defendants who caused the harm and awarded just over $150 million in damages.

Omega Morgan Sarens (Omega), the owner and operator of the mobile crane used to lower down sections of the tower crane being disassembled, appeals. It claims the court excluded evidence of a "Mary Carter agreement," erroneously instructed the jury, allowed an expert to testify to a legal conclusion, and erroneously denied its motion for a new trial based on misconduct during closing argument. Finding no error, we affirm.

FACTS

The general contractor for a building construction project, GLY Construction (GLY), leased a tower crane from Morrow Equipment (Morrow), and Seaburg Construction supplied an operator for it. When construction neared completion, GLY hired Northwest Tower Crane (NWTC) to disassemble the tower crane. NWTC hired Omega to use its mobile crane to lower pieces of the tower crane to the ground as NWTC's ironworkers disassembled it.

Disassembly of the tower crane began on Saturday, April 27, 2019. That morning, GLY, Morrow, NWTC, and Omega held a safety meeting. The parties discussed who was in charge of the disassembly, the weather conditions, and the mobile crane's "load charts," which specified its wind limits. The weather that morning was "good," but the most recent forecast described the weather as

"breezy" with northwest winds of 15 to 25 m.p.h. expected. As initially configured, the mobile crane would have to stop work if the winds exceeded 11 m.p.h.

The contractors had developed a "lift plan" that would lower the disassembled tower crane down in sixteen separate lifts by the mobile crane. Importantly, that plan called for shortening the mobile crane's main boom from 179 feet in length to 147 feet before attempting the disassembly's single biggest "critical" lift, the ninth lift of the tower crane's slewing assembly.[1] A lift is "critical" if it requires more than 75 percent of the mobile crane's lifting capacity. Eight of the lift plan's sixteen lifts, lifts nine through sixteen, were critical lifts. For a critical lift, reducing the boom's length gives the mobile crane greater lifting capacity. The slewing assembly was not only heavy, it was dimensionally large as well.[2] Consequently, the mobile crane's operating manual advised not attempting such a lift if the winds were 8 m.p.h. or greater.

Despite the lift plan, Omega's mobile crane operator attempted the critical lift of the slewing assembly without shortening the mobile crane's main boom. The mobile crane was unable to hoist the slewing assembly. NWTC's ironworkers tried unsuccessfully to pry it free. Omega's mobile crane operator decided to unhook the mobile crane from the tower crane to reconfigure the mobile crane, and NWTC's ironworkers went ahead disassembling the tower crane by removing pins that secured one section of the tower crane to the next.

---

[1] The slewing assembly is where the tower crane's operator sat and the point at which its boom rotated left or right atop the tower.
[2] The slewing assembly weighed 33,070 pounds and was 20 feet tall by 12 feet wide.

3

When the mobile crane was ready 30-45 minutes later, according to its operator, the wind "was blowing like 10 – 12 meters" [22-27 miles per hour], so the operator told NWTC that it had to shut down for the day.[3] Destabilized, the disassembled tower crane was "standing really tall . . . and the wind c[ame] along and bl[ew] it over." The tower crane collapsed and fell onto a busy city street, killing four people and injuring five.[4] Respondents on appeal include the estates of two of the deceased and three of the injured.[5]

Respondents individually sued GLY, Morrow, Seaburg, NWTC, and Omega, and their cases were consolidated. Respondents demanded policy limits and settled with GLY, Morrow, and Seaburg; none of those three companies was a defendant at trial, and none is a party to this appeal. NWTC offered its policy limits but, because Omega refused to settle, Respondents refused its offer. Omega then lifted all limits and proceeded to trial with NWTC as its codefendant. Because there was no question that Respondents were free of fault, under RCW 4.22.070(1)(b), Omega and NWTC would be jointly and severally liable for all damages caused by their fault.

The jury found GLY, Morrow, NWTC, and Omega negligent. It found

---

[3] The mobile crane possessed the only working wind speed gauge on the job site; the tower crane's had already been disassembled.

[4] Alan Justad died at the scene when a part of the tower crane fell onto his vehicle on Mercer Street. The same part fell on an Uber car. Uber passenger Sarah Wong died at the scene. Her friend and fellow passenger Brittany Cadelina was injured, as was the Uber's driver, Ali Edriss. Another piece of the crane fell on the back of Sarah Beaven's car, injuring her. Jennifer and Eloisa Kois were in a vehicle struck by a part of the crane; they settled their claims and are not part of this appeal. NWTC ironworkers Travis Corbet and Andrew Yoder were killed in the collapse; the claims of their estates are the subject of separate lawsuits.

[5] NWTC is also a Respondent to the appeal. Other than where indicated, we use the plural term Respondents to refer to the parties who were plaintiffs at trial, not NWTC.

Morrow, NWTC, and Omega proximately caused Respondents' injuries. The jury awarded damages of just over $150 million, and it apportioned 25 percent of the fault to nonparty Morrow, 45 percent to NWTC, and 30 percent to Omega.

The court entered judgment on the jury's verdict. The court denied Omega's motions for a new trial, remittitur, and post trial discovery. Omega timely appeals.

## DISCUSSION

Omega raises four assignments of error: the court's exclusion of evidence of a "Mary Carter agreement"[6]; a jury instruction regarding duty and the entities who owed a duty; allowing an expert to testify to a legal conclusion; and the denial of its motion for a new trial.

I.      Exclusion of Evidence of a Mary Carter Agreement

Omega argues that the trial court erred by excluding evidence of a Mary Carter agreement between Respondents and NWTC and by failing to instruct the jury about a Mary Carter agreement. Respondents and NWTC argue Omega has no such evidence.[7] We agree with the Respondents and NWTC.

---

[6] A "Mary Carter agreement, named for an early case, is a contract between a plaintiff and one defendant allying them against another defendant at trial." John E. Benedict, *It's A Mistake to Tolerate the Mary Carter Agreement*, 87 COLUM. L. REV. 368, 372 (1987), cited in Barton v. Dep't of Transp., 178 Wn.2d 193, 212 n.6, 308 P.3d 597 (2013). In a multi-defendant lawsuit, a Mary Carter agreement gives a settling codefendant and plaintiffs an incentive to "concentrate their combined energies against the nonsettling defendant to improve their financial positions at the expense of the nonsettling defendant." Id. Specifically, a Mary Carter agreement "establishes a ceiling on the settling defendant's liability, but the amount he ultimately pays is determined by the court's judgment against his codefendant." Benedict, supra, at 368-70.
[7] NWTC's brief incorporated by reference the argument of the other Respondents on this issue.

This court reviews trial court rulings on motions in limine for abuse of discretion. Colley v. PeaceHealth, 177 Wn. App. 717, 723, 312 P.3d 989 (2013) (citing Gammon v. Clark Equip. Co., 38 Wn. App. 274, 286, 686 P.2d 1102 (1984), aff'd, 104 Wn.2d 613, 707 P.2d 685 (1985)). "A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or untenable reasons." In re Marriage of Littlefield, 133 Wn.2d 39, 46-47, 940 P.2d 1362 (1997).

In a civil case, "evidence of . . . accepting or offering or promising to accept a valuable consideration in compromising or attempting to compromise a claim . . . is not admissible to prove liability for or invalidity of the claim or its amount." ER 408. But the rule "does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness . . . ." Id.

NWTC moved in limine to exclude "any evidence of discussions between the parties regarding efforts made to settle" under ER 408. Omega opposed the motion, arguing that "perhaps there is . . . an agreement to agree . . . requiring ongoing cooperation with [Respondents] as they try their claims against Omega and/or NWTC, in exchange for a covenant not to execute any judgment above an entities' policy limits." Omega's opposition stemmed from the deposition testimony of NWTC's CR 30(b)(6) representative, David Weber:

> Q. So, Mr. Weber, are you aware of any agreement between [NWTC] and the plaintiffs in terms of a resolution or partial resolution of the claims against [NWTC]?

A. I am.

Q. And what agreement are you aware of?

A. That we surrender our limits.

Q. And so you have reached an agreement to surrender your limits?

[Counsel for NWTC] [Counsel], I think we have to take a break to address attorney-client privilege to make sure that [Weber] is answering your question appropriately.
. . . .
Q. Mr. Weber, do you have any knowledge of any agreement between [NWTC] and the plaintiffs in this lawsuit to resolve the claims in the case?

[Counsel for NWTC] You may answer.

[A.] Thank you.
I have some knowledge. I know we offered our insurance limits that were then rejected by the plaintiffs and is currently under negotiation; so there is no deal at this point.

Q. Have you -- do you understand whether or not NWTC, your company, will have any exposure beyond your limits if you take the case to trial?

A. That's my understanding.

The court granted NWTC's motion to exclude at trial any evidence of settlement discussions between any of the parties.[8]

On appeal, Omega argues Weber's testimony is evidence of a collusive Mary Carter agreement. But Weber's full testimony was that NWTC offered its insurance limits to settle and that offer was not accepted, so "there is no deal at

---

[8] Omega also filed a motion to continue the trial and compel discovery and, post-trial, a motion for additional discovery regarding the same issue. The court denied both motions.

this point."[9]

Omega also asserts that NWTC's trial strategy of blaming Omega, supporting Respondents' experts, and "undermining Omega's attempts to allocate fault to nonparties GLY and Morrow," "raises questions as to the existence of an agreement." However, a "list of parallel positions taken . . . , although extensive, does not, by itself, establish collusive conduct." McCluskey v. Handorff-Sherman, 68 Wn. App. 96, 105, 841 P.2d 1300 (1992).

Ultimately, Omega provided nothing more than speculation that "perhaps" an agreement exists. Offered no evidence of a Mary Carter agreement, the trial court acted reasonably by excluding all evidence of settlement negotiations between the parties under ER 408. Therefore, the trial court did not abuse its discretion by granting NWTC's motion in limine excluding any evidence of settlement negotiations.[10]

---

[9] Omega further complains that Weber "contradicted" himself after taking a short break. However, deposition testimony can be corrected any time before it is signed. CR 30(e). Weber's changed testimony does not provide evidence of collusion.

[10] Respondents also argue that Omega failed to preserve this issue because it did not assign error to the court's specific orders granting NWTC's motion in limine, denying Omega's motion to continue the trial and compel discovery, or denying Omega's post-trial motion for additional discovery. "The scope of a given appeal is determined by the notice of appeal, the assignments of error, and the substantive argumentation of the parties." Clark County v. W. Wash. Growth Mgmt. Hr'gs Review Bd., 177 Wn.2d 136, 144, 298 P.3d 704 (2013). Omega's notice of appeal attached the trial court's order denying its motion for a new trial. That motion argued that NWTC "behaved consistent[ly] with the existence of a Mary Carter agreement." Omega's reply in support of its new trial motion asked the court to reserve ruling on this issue because it would seek leave for additional, limited discovery post-trial. Accordingly, the court did not rule on the issue when it denied Omega's motion, but it wrote that "[t]his issue is resolved upon by separate order for that motion." The court denied Omega's motion for additional, limited post-trial discovery regarding the issue. We agree with Respondents that Omega waived any challenge to the court's separate order regarding post-trial discovery by failing to assign error to that order. See SEIU Healthcare 775NW v. Dep't of Soc. & Health Servs., 193 Wn. App. 377, 396, 377 P.3d 214 (2016) (challenge to a discovery order waived where the appellant assigned error to consolidation of preliminary and permanent injunction hearings but not separately to the

II.      Jury Instructions on Duty

Omega argues the trial court misstated the law regarding duty because it was not a possessor of land or it had ceased work when the crane fell. Alternatively, it argues the court improperly focused the jury's attention on Respondents' theory of the case by omitting nonparties Morrow and GLY from Instruction 17. Respondents argue the instruction properly states the duty Omega and NWTC owed, and the instructions as a whole did not prejudice Omega. We agree with the Respondents.

We review de novo whether a jury instruction reflects an accurate statement of the law. Terrell v. Hamilton, 190 Wn. App. 489, 498, 358 P.3d 453 (2015) (citing Gregoire v. City of Oak Harbor, 170 Wn.2d 628, 635, 244 P.3d 924 (2010)). But a trial court's decision regarding how to word an instruction or whether to give a particular instruction is reviewed for an abuse of discretion. Id. (citing Douglas v. Freeman, 117 Wn.2d 242, 256, 814 P.2d 1160 (1991)). "A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or untenable reasons." Id. at 499 (quoting Littlefield, 133 Wn.2d at 46-47).

"Jury instructions are sufficient when they allow counsel to argue their theory of the case, are not misleading, and when read as a whole properly inform

---

court's order disallowing a 30(b)(6) deposition and limiting discovery to three topics). However, in its new trial motion, to which Omega did assign error, Omega included a broader challenge to the trial court's exclusion of evidence of a Mary Carter agreement, as it does on appeal. Thus, Omega's challenge to the court's rulings on this issue was sufficiently preserved for review.

the trier of fact of the applicable law." Bodin v. City of Stanwood, 130 Wn.2d 726, 732, 927 P.2d 240 (1996), quoted in Anfinson v. FedEx Ground Package Sys., Inc., 174 Wn.2d 851, 860, 281 P.3d 289 (2012). A misleading instruction will not be the basis for reversal unless prejudice is shown. Terrell, 190 Wn. App. at 502 (citing Keller v. City of Spokane, 146 Wn.2d 237, 249, 44 P.3d 845 (2002)). Such an instruction is harmless if it did not affect the outcome of the case. Id. (citing Blaney v. Int'l Ass'n of Machinists & Aerospace Workers, Dist. No. 160, 151 Wn.2d 203, 211, 87 P.3d 757 (2004)).

### A. Omega's Duty as a Possessor of Land

Instruction 17 stated Omega's duty as follows: "Omega Morgan and Northwest Tower Crane owed a duty to exercise ordinary care to prevent their activities from injuring people on nearby streets and property." Here, Omega argues it did not possess the premises housing the tower crane or the tower crane itself, so it had no duty. However, "the duty owed by a landlord may also be owed derivatively by a person who acts on behalf of the landlord." Williamson v. Allied Grp., Inc., 117 Wn. App. 451, 456, 72 P.3d 230 (2003), review denied, 151 Wn.2d 1039 (2004) (quoting RESTATEMENT (SECOND) OF TORTS § 383 (1965)). Here, the undisputed evidence was that GLY was the building's general contractor, that GLY hired NWTC to disassemble the tower crane, and that NWTC hired Omega to help lift sections of the disassembled tower crane to the ground.

Omega then claims that even if it was a possessor of the land, it "had

ceased operations well before the tower crane collapsed." Thus, it argues, "there was no legal basis to instruct the jury that Omega owed a land possessor's duty to prevent injury to those on nearby streets." But a contractor creating a dangerous condition on the land is subject to the same liability as though it were the possessor of the land. Williamson, 117 Wn. App. at 457 (applying RESTATEMENT (SECOND) OF TORTS § 384). As discussed in Williamson, § 384 states:

> One who on behalf of the possessor of land erects a structure or creates any other condition on the land is subject to the same liability, and enjoys the same freedom from liability, as though he were the possessor of the land, for physical harm caused to others upon and outside of the land by the dangerous character of the structure or other condition while the work is in his charge.

RESTATEMENT (SECOND) OF TORTS § 384, cited in Williamson, 117 Wn. App. at 457. Thus, whether a contractor has derivative liability under § 384 "depends on whether [the contractor] created a dangerous condition on the land . . . while the work was in progress." Williamson, 117 Wn. App. at 459. "The phrase 'while the work is in his charge' does not limit the contractor's liability spatially to the specific site under the contractor's direct physical control. Rather, it limits the contractor's liability temporally to harm occurring while the contractor is engaged in its work." Id. at 457 (citations omitted). Also, RESTATEMENT (SECOND) OF TORTS § 384 cmt. g, titled "When possessor accepts work," explains that a contractor's "charge and control is usually terminated by the possessor's acceptance of the completed work."

Omega contends that because it "did not have any personnel on or near the tower crane," and had "shut down" for the day owing to the gusting wind, it owed no duty. But Omega admits it "was retained by NWTC for the sole purpose of providing 'hook service' . . . to lower pieces of the subject tower crane to the ground." And the record shows Omega stopped work to shorten the boom of its mobile crane to increase its power only after it attempted, and failed, to carry away the slewing assembly, the single heaviest piece of the tower crane. When Omega then stopped work for the rest of the day because of high winds, it had not completed the "particular work entrusted" to it. RESTATEMENT (SECOND) OF TORTS § 384 cmt. d. Thus, Omega was still engaged in the work entrusted to it when the tower crane collapsed. The court's instruction that it owed a duty as a possessor of land was not an erroneous statement of the law.

B. Omission of GLY and Morrow from Instruction 17

Omega argues that even if it did owe a duty as a possessor of the land, the court improperly focused the jury's attention on Respondents' theory of the case by omitting nonparties GLY and Morrow from Instruction 17. According to Omega, the jury was not instructed it could apportion fault to GLY and Morrow, and even 1 percent of fault apportioned to those parties would have reduced its liability by more than $1 million. We hold that it was not error to omit GLY and Morrow from Instruction 17.

As discussed above, Instruction 17 stated: "Omega Morgan and Northwest Tower Crane owed a duty to exercise ordinary care to prevent their

12

activities from injuring people on nearby streets and property." Instruction 9 stated Omega and NWTC's claim that nonparty entities GLY and Morrow were negligent and proximately caused the tower crane's collapse. Instruction 14 stated:

> If you find that more than one entity was negligent, you must determine what percentage of the total negligence is attributable to each entity that proximately caused the crane collapse. The court will provide you with a special verdict form for this purpose. Your answers to the questions in the special verdict form will furnish the basis by which the court will apportion damages, if any.
> Entities may include the defendants Omega Morgan and Northwest Tower Crane and entities not a party to this action GLY Construction and Morrow Equipment.

Instruction 15 explained that Omega or NWTC had the burden to prove, first, that the nonparty entities were negligent and, second, that the entities' negligence was a proximate cause of the injury or damages in order to be apportioned liability.

The court's instructions were accompanied by a special verdict form that asked four questions. First, it asked, "Were any of the following negligent?" It listed "Defendant: Northwest Tower Crane," Defendant: Omega Morgan," "GLY Construction," and "Morrow Equipment." The jury answered "YES" in the space provided next to each company.

Then the special verdict form asked if the negligent company was a proximate cause of death or injury. The jury answered "YES" for each company except GLY, to which it answered "NO." The third question asked the jury for each plaintiff's damages.

13

The special verdict's last question asked the jury to apportion its damages "to each entity whose negligence was a proximate cause of such injury . . . . Your total must equal 100%." The jury apportioned 45 percent of the damage to NWTC, 30 percent to Omega, 0 percent to GLY, whose negligence the jury had decided was not a proximate cause of injury, and 25 percent to Morrow.

Instruction 14 clearly tells the jury it may apportion fault to nonparties GLY and Morrow, and the jury indeed found both negligent. The jury further found that Morrow's negligence was a proximate cause of plaintiffs' injuries and it apportioned to Morrow, a nonparty, 25 percent of the fault. Read as a whole, the court's instructions and special verdict form allowed Omega "to argue [its] theory of the case," i.e., that nonparties GLY and Morrow should be apportioned fault. Anfinson, 174 Wn.2d at 860. Therefore, the trial court's instructions did not misstate Omega's duty as a possessor of the land, were not misleading, and allowed Omega to argue its theory of the case.[11]

III.    Expert Testimony

Omega argues it was improper for the Respondents' expert Dr. Singhose to testify that Omega was negligent because that is a legal conclusion.

---

[11] Respondents also argue that Omega waived any appeal regarding Instruction 17 because it did not object to it until *after* the court began instructing the jury, even though CR 51 requires objecting *before* the jury is instructed. CR 51(f). However, the court specifically allowed Omega to file written objections later the same morning that it began instructing the jury. "[U]nder some circumstances compliance with the purpose of [CR 51(f)] will excuse technical noncompliance." Queen City Farms, Inc. v. Cent. Nat. Ins. Co. of Omaha, 126 Wn.2d 50, 63, 882 P.2d 703 (1994). Thus, Omega's objection was preserved, and, because Instruction 17 was argued in the CR 59 motion to which Omega assigned error and was substantively briefed, the issue is properly before this court. See Clark County, 177 Wn.2d at 144 ("The scope of a given appeal is determined by the notice of appeal, the assignments of error, and the substantive argumentation of the parties.").

Respondents argue that Dr. Singhose's testimony was about the facts of causation, not a conclusion of negligence, and ER 704 allows an expert witness to testify to an ultimate issue that the trier of fact must resolve. We agree with the Respondents.

The standard of review for evidentiary decisions is an abuse of discretion. Gerlach v. Cove Apartments, LLC, 196 Wn.2d 111, 119, 471 P.3d 181 (2020). A trial court abuses its discretion when its decision is manifestly unreasonable or based upon untenable grounds or reasons. Hamblin v. Castillo Garcia, 23 Wn. App. 2d 814, 833, 517 P.3d 1080 (2022) (citing Salas v. Hi-Tech Erectors, 168 Wn.2d 664, 668-69, 230 P.3d 583 (2010)). A trial court's decision is manifestly unreasonable if it adopts a view no reasonable person would take. Id.

Regarding expert testimony on ultimate issues, this court has stated,

> [W]hile expert testimony is admissible even if it embraces an ultimate issue to be decided by the trier of fact if it will assist the trier of fact to understand the evidence or determine a fact in issue, ER 702 and 704, experts are not to state opinions of law or mixed fact and law, such as whether X was negligent . . . .

Hiskey v. City of Seattle, 44 Wn. App. 110, 113, 720 P.2d 867 (1986) (citations omitted); see also 5B KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE § 704.7, at 281 (6th ed. 2016) ("In a civil case based on negligence, it is improper for a witness to express a personal opinion on whether the defendant was negligent as alleged in the complaint.").

In the testimony at issue, the following exchange occurred:

Q. In your opinion, did the negligence of Omega in failing to follow the critical lift plan and getting stuck up there, was it a contributing factor to the premature pin removal?

[COUNSEL FOR OMEGA]: Objection; foundation, calls for a legal conclusion.

THE COURT: No, I think it calls for a fact opinion. Overruled. Go ahead.

[DR. SINGHOSE]: Yeah, I mean, I think if they had reconfigured and pulled [the slewing assembly] off, things would have just kept going at the same, you know, rate that they are used to doing this. Which is, they take a piece off, the ironworkers go down, take out pins, the crane is back, take the next piece off. I mean, the fact that they failed at this lift threw everything out of sequence, and all these pins were removed prematurely.

Here, Omega argues Dr. Singhose's response "Yeah" allowed him to provide "improper and prejudicial expert testimony that Omega was negligent . . . ." The question to which Dr. Singhose responded does include the words "negligence of Omega," and "experts are not to state opinions of law or mixed fact and law, such as whether X was negligent." Hiskey, 44 Wn. App. at 113. But rather than premising the question on the acceptance of the proposition that Omega had been negligent—the impermissible legal conclusion—the question instead set out the predicate facts for the alleged negligence: Omega's "failing to follow the critical lift plan." Dr. Singhose's answer about whether that failure was a contributing factor does not opine that Omega was negligent. Instead, after answering "Yeah," his response then details the additional predicate facts that support his opinion on causation: the proper sequence and how the failure to follow the lift plan "threw everything out of sequence" and led to

16

NWTC having disassembled the tower crane prematurely. This information is a proper topic for his expert opinion. Therefore, the trial court did not abuse its discretion by allowing Dr. Singhose's testimony as to causation.

IV.    Counsel's Misconduct in Closing Argument

Omega argues that it is owed a new trial because it was "robbed" of a fair trial by the prejudicial and uncured misconduct of counsel for one Respondent, Wong, at closing argument. Respondents argue there was no misconduct or prejudice, and this court should not substitute its judgment for that of the trial court.[12] We conclude that, while there was misconduct, Omega was not prejudiced because the record shows the court's instructions, read as a whole, correctly instructed the jury and the jury followed the court's special verdict form.

CR 59(a) provides in relevant part that a court may vacate a verdict and grant a new trial based on "misconduct of [the] prevailing party."[13] A new trial

---

[12] Respondents also argue that "Omega's complaints are largely unpreserved." But Omega's notice of appeal attached the trial court's order denying its motion for a new trial based on misconduct, so it assigns error to that decision, and Omega also provided substantive argument on this point. See Clark County, 177 Wn.2d at 144 (scope of appeal); see also Teter v. Deck, 174 Wn.2d 207, 226, 274 P.3d 336 (2012) ("It would be onerous to require a party to also move for mistrial to preserve a claim for error based on misconduct.").

[13] CR 59 states in relevant part:

(a) Grounds for New Trial or Reconsideration. On the motion of the party aggrieved, a verdict may be vacated and a new trial granted to all or any of the parties, and on all issues, or on some of the issues when such issues are clearly and fairly separable and distinct, or any other decision or order may be vacated and reconsideration granted. Such motion may be granted for any one of the following causes materially affecting the substantial rights of such parties:

. . . .

(2) Misconduct of prevailing party or jury; and whenever any one or more of the jurors shall have been induced to assent to any general or special verdict or to a finding on any question or questions submitted to the jury by the court, other and different from the juror's own conclusions, and arrived at by a resort to the

premised on misconduct is appropriate when " 'misconduct of [the] prevailing party' 'materially affect[s] the substantial rights of [the aggrieved] parties.' " Coogan v. Borg-Warner Morse Tec Inc., 197 Wn.2d 790, 806, 490 P.3d 200 (2021) (quoting CR 59(a)(2)). A party seeking a new trial for misconduct must establish that (1) the challenged conduct was actually misconduct, (2) the misconduct was prejudicial, (3) the misconduct was objected to at trial, and (4) the misconduct was not cured by the trial court's instructions. Coogan, 197 Wn.2d at 806 (citing Teter v. Deck, 174 Wn.2d 207, 226, 274 P.3d 336 (2012)).

Appellate courts review a trial court's denial of a motion for a new trial for abuse of discretion. Id. " '[I]t is in this area of the new-trial field that the favored position of the trial judge and his sound discretion should be accorded the greatest deference.' " Id. (quoting Baxter v. Greyhound Corp., 65 Wn.2d 421, 440, 397 P.2d 857 (1964) (other citations omitted)). "Accordingly, appellate courts will defer to the reasoned judgment of the trial court '[u]nless some prejudicial effect is clear from the record.' " Id. (quoting Gilmore v. Jefferson County Pub. Transp. Benefit Area, 190 Wn.2d 483, 503, 415 P.3d 212 (2018)).

At closing argument, counsel for Omega argued:

> And as you decide damages in this case -- and, again, we don't believe you should be deciding damages against Omega Morgan, but you will be determining the amount of damages that [NWTC], Morrow, maybe GLY are responsible for, and when you do that, you need to come up with your own numbers that are fair and reasonable.

determination of chance or lot, such misconduct may be proved by the affidavits of one or more of the jurors[.]

Later during closing arguments, counsel for one of the Respondents, Wong, argued:

> They want to act like if you put a percentage on Morrow or GLY that they'll have to pay that. They don't. That was wrong, misleading, a misstatement of the law and the instructions. Any amount you put on Morrow or GLY, any percentage is multiplied times --
>
> [COUNSEL FOR OMEGA]: Your Honor, I'm going to object. Counsel is getting really close to a line that he's not supposed to cross.
>
> [COUNSEL FOR WONG]: That is the law and he misstated it. That is how the second --
>
> . . . .
>
> THE COURT: All right. [Counsel for Wong], I think [Counsel for Omega] has a point, so move forward, please.
>
> [COUNSEL FOR WONG]: All right. The only defendants in this case are Omega and [NWTC]. There is no judgment against Morrow or GLY. This case involves Omega and [NWTC]. They want to blame --
>
> [COUNSEL FOR OMEGA]: Your Honor, I'm going to object again.
>
> THE COURT: [Counsel for Omega], your objection is sustained.
>
> [COUNSEL FOR OMEGA]: Thank you.
>
> THE COURT: Yeah.
>
> [COUNSEL FOR WONG]: They're not defendants, let's put it that -- that's obvious.

Omega asked for an instruction on joint and several liability because counsel for Wong "crossed a line by saying that those . . . entities in the case, were entities who wouldn't have to pay." Omega argued the jury "should be told

19

that, you know, Omega Morgan may end up paying for any verdict that's rendered against [NWTC]. That's what I'm saying."

The court declined to give such an instruction. It explained that such an instruction "would probably be reversible error on my part if I was to do that." The court also declined to reinstruct the jury on its need to follow the jury instructions and special verdict form. Later, when it denied Omega's motion for a new trial, the court decided Wong's statements to the jury were misconduct, but it found that this single instance of misconduct did not result in prejudice, and it decided that Omega did not ask for any appropriate curative instruction.

Here, Wong's statement at closing was misconduct because Wong invited the jury to award damages based on more than the law and the evidence. See M.R.B. v. Puyallup Sch. Dist., 169 Wn. App. 837, 858, 282 P.3d 1124 (2012) ("It is improper for counsel to invite the jury to decide a case based on anything other than the evidence and the law, including appeals to sympathy, prejudice, and bias."). RCW 4.22.070(1)(b) provides that if "the plaintiff is fault free, then the defendants against whom judgment is entered are jointly and severally liable" for the damages awarded by the jury. See Higgins v. Intex Recreation Corp., 123 Wn. App. 821, 835, 99 P.3d 421 (2004). Omega's statement during closing asking the jury to use "fair and reasonable" numbers in determining "the amount of damages that [NWTC], Morrow, maybe GLY are responsible for," did not "open up" the question of how RCW 4.22.070 operates. Cf. Safeco Ins. Co. of Am. v. JMG Rests., Inc., 37 Wn. App. 1, 18, 680 P.2d 409 (1984) (attorney made

statements outside the record and, thus, had "opened up" the matter and argued it). But by stating to the jury that settling nonparties GLY and Morrow would not be responsible for damages beyond their settlements, counsel for Wong encouraged the jury to apportion fault for reasons outside the trial's evidence and the court's instructions. Thus, Omega can establish the first element for a new trial under CR 59(a), that the challenged conduct was misconduct. Omega also satisfies the third element, as it objected to Wong's counsel's misconduct below.

However, Omega cannot show the second element, that the misconduct was prejudicial, or the fourth element, that the misconduct was not cured by the trial court's jury instructions. As discussed above, Instruction 14 stated that the jury could apportion negligence to each entity proximately at fault, and "[e]ntities may include . . . entities not a party to this action GLY Construction and Morrow Equipment." Juries are presumed to follow instructions, Coogan, 197 Wn.2d at 807, so the presumption is not rebutted here where the jury's verdict found nonparties GLY and Morrow both negligent. And the additional instruction Omega requested on joint and several liability would not have been curative, but instead would have resulted in error, because in a multi-defendant case under RCW 4.22.070, the trier of fact apportions fault, not damages. See Higgins, 123 Wn. App. at 835 (explaining that an instruction on joint and several liability in a multi-defendant case where plaintiffs were free of fault was not required because "[t]he trial court must instruct in a manner that allows each party to argue its

21

theory of the case."). Thus, the trial court properly declined to give the additional instruction Omega requested.

Nor does the record support that the misconduct was prejudicial where the verdict apportioned 25 percent of the negligence to nonparty Morrow. Instead, the record shows the jury followed the court's instructions, found damages, and allocated fault without concerning itself about which entities would pay. Therefore, we conclude that the trial court did not abuse its discretion by denying Omega's motion for a new trial.[14]

Affirmed.

_Chung, J._

WE CONCUR:

_Coburn, J._     _Mann, J._

---

[14] Omega also suggests, in the last two paragraphs of its brief, that cumulative error requires reversal and a new trial. There is no further support for the suggestion in its reply brief. Such "[p]assing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration." Palmer v. Jensen, 81 Wn. App. 148, 153, 913 P.2d 413 (1996).